[No. 3867.]

RHODE v. STEINMETZ.

1. ELECTIONS—CONTESTS—BALLOTS—BURDEN OF PROOF.

In an election contest the ballots cast by the voters is the primary and best evidence of the intention of the voters, but the burden of proof is on the contestor to show that the ballots have been preserved in the manner provided by law and have not been tampered with, and the fact that the ballots have been in the custody of the proper officers from the time of the canvass to the time of the recount is only *prima facie* and not conclusive proof of their integrity.

2. SAME.

In an election contest the rule that as between the ballots and the canvass of them, the ballots control, has no application where the ballots have been tampered with. The court must be sure that it has before it the identical and unaltered ballots deposited by the voters before they become controlling as against the certificate of the election officers of the result of the canvass.

3. SAME.

In an election contest where the evidence shows that the care and custody of the ballots has been such that they might have been tampered with, they are not admissible in evidence, unless there is evidence tending to prove that they are in the same condition as when canvassed, and if the evidence in the first instance is sufficient to admit the ballots, it is still proper to consider any evidence tending to impeach their integrity; and if upon recount, the evidence establishes that the ballots are not in the condition they were when canvassed, they must be rejected.

4. APPELLATE PRACTICE—FINDINGS OF TRIAL COURT.

The rule that appellate courts will not review the findings of trial courts upon conflicting evidence, does not apply, where the finding is the result of bias or prejudice, mistake or misapprehension, or misconception of the legal effect of the evidence, or where the finding is manifestly against the weight of the evidence.

5. ELECTIONS—CONTEST—EVIDENCE.

In an election contest where the evidence showed that the ballot boxes from the time of the canvass had been in the custody of the proper officer and so far as he or his employees knew, their contents had not been tampered with, but the boxes were kept in a vault easy of access by day, and others besides the officers might have entered at any time, and the election judges and clerks testified that the canvass of the vote made by them was correct, and the ballots themselves on recount indicated that they had been tampered with, a

finding of the trial court sustaining a recount of the ballots in preference to the return of the election officers, that changed the result of the election was manifestly against the weight of the evidence.

*Appeal from the County Court of El Paso County.*

Messrs. RIDDELL & STARKWEATHER and Mr. ALBERT S. FROST, for appellant.

Messrs. FELKER & DAYTON, for appellee.

MR. JUSTICE GABBERT delivered the opinion of the court.

Appellant received a certificate certifying that at the last regular election of county officers for the county of El Paso, he was elected treasurer. This certificate was based upon a canvass of returns made by the judges and canvassers of election in the several precincts of the county, according to which he was elected by a plurality of 106 votes over his competitor, the appellee. The latter contests his election upon the ground that in specified precincts there was error and mistake in the canvass of the votes by the officers charged with the duty of determining the results from the ballots cast, in this, that in these several precincts there were votes cast for him to the number of 269, which by error and mistake were not so counted; and that for like reasons, votes to the number of 222 were counted for appellant which in fact were not cast for the latter. Fraud, malconduct and corruption were also charged in the statement of contest, but so far as disclosed by the evidence, there was no attempt to prove these charges, the testimony being limited to the issues of error and mistake.

At the trial of this contest there was introduced on behalf of appellee the testimony of the county clerk, which in substance was that the boxes containing the ballots cast in these precincts were delivered to him in the regular way and by the proper persons, within two days after election, and since that date had been in his custody and possession in the vault

in his office, which vault was secured by an ordinary combination lock, and so far as he knew, had been safely kept, and were in the same condition as delivered; that the combination of the lock was known by two of his office employees, and that all so employed, numbering eleven or twelve, had access to the vault when opened during business hours; that he thought, though not positive, that the combination of the lock was the same as when he assumed the duties of the office; that reputable citizens, whose business from time to time required an examination of the records of the office, had access to the vault during business hours; that he was not at the office all the time during these hours; but that neither of the ballot boxes could have been opened in the vault without being observed by some employee in the office; that there were a large number of ballot box keys in and about the office, kept specially for the purpose of replacing those lost.

The evidence of the deputies who knew the combination to the vault was to the effect that usually either one or the other attended to opening and closing it; that to the knowledge of neither had it been opened after business hours, or during the evening or night; and that so far as they knew, no one had interfered with the ballot boxes; that from the positions they occupied in the office when on duty, no one could enter the vault without their knowledge. It was also stipulated by counsel that the evidence of each of the other clerks in the office would be substantially the same as the last two. On behalf of appellee this evidence was supplemented by the testimony of the judges of the several precincts from which the boxes were opened and the ballots recounted, except in 60, in which only two were called. This testimony was to the effect that in their judgment the respective boxes, so far as they could observe, were in the same condition as when locked and sealed after the canvass of the ballots was completed. Upon the introduction of this testimony, the ballot boxes from the precincts in which a recount was demanded, were opened and the ballots offered and admitted on behalf of appellee for the purpose of a recount.

The contest was finally narrowed to six precincts, for the reason that the recount of ballots in the others specified in the statement of contest did not affect the result; and a review of the evidence will be limited to these precincts.

Appellant then introduced as witnesses the judges, clerks, watchers and constables in these precincts who participated in or were present when the votes were being counted, varying in number from three to six in each, whose testimony was clear and positive that the count made was correct; and that no ballots were counted for him to which he was not entitled, and none omitted with which appellee should have been credited; and that none doubly marked in the emblems or body in such a manner as to nullify the vote for appellant were counted for treasurer; that the ballots exhibited before the court so doubly marked were not in that condition when counted. It also appears from this evidence that the utmost care was exercised on the part of the election officers to prevent mistake, and the ballots carefully examined for the purpose of ascertaining for whom cast. Politically these witnesses represented the respective parties, or some of them, of which the parties to this contest were candidates; and from their statements relating to their business and experience, were persons of intelligence and education, and fully capable of comprehending and performing the duties for which they were selected. Appellant also called the county clerk and interrogated him relative to the proposition that the boxes could be unlocked and the contents removed without in any manner disturbing the seals placed upon the boxes by the judges, and the contents replaced and the boxes relocked without leaving any appearance that they had been opened. The court, without hearing further evidence on this subject, and at the request of appellant, made the following statement:

"That the keys to the ballot boxes 43, 52, 56, 58, 59 and 60, after being opened by the judges of the several precincts, were delivered by said judges to the court, by consent of both parties, since which time the court has, on one or more occasions, opened each of said boxes with the keys in his posses-

sion, and allowed the ballots to be taken therefrom, without interfering with the seal of the ballot box; and the court could perceive no change in the physical condition of the boxes after being closed, from what they were previous, except in one case by accident where the seal had become loosened and dropped off."

In rebuttal appellee introduced a number of witnesses who were in some manner officially connected with the reception and canvass of the ballots in the six precincts above mentioned, on which branch of the case the testimony in substance, with reference to the particular precinct to which it referred, was: that a number of ballots doubly marked in the emblems were counted and canvassed; that all the ballots so marked were not conflicting as to all the candidates. None of these witnesses, however, pretend to state that any ballot was improperly counted, or that any candidate was credited with a vóte on ballots so marked to which he was not entitled; nor does either of these witnesses state that any mistake or error was made, or that the canvass and count was not correct; but on the contrary, when interrogated on the subject admit that they were satisfied with the count when made, and believed then it was correct. One of these witnesses stated that he remembered one doubly marked ballot in particular, over which there was quite a controversy, but which it was finally decided was not so marked as to be in conflict, but does not intimate that the decision was not correct. A witness who acted as watcher in one of the precincts stated that he noticed a number of doubly marked ballots counted; that there might have been twenty or thirty of that kind, but whether they were marked in such manner as to be conflicting, or for whom counted, he does not state. In this precinct twenty-one ballots were returned by the judges as defective on account of being doubly marked. Another witness who acted as judge in one of these precincts, states that some of the ballots were doubly marked, but in respect to an examination of them by himself, it was to the effect that he scrutinized each one carefully, as he did most of the calling off, for the

purpose of enabling the clerk to make the tally; that doubly marked ballots were counted for some of the candidates, but he does not claim incorrectly; on the contrary says he did not see anything wrong in the count.

There is no claim that the ballots were tampered with in transit from the polling places to the office of the county clerk.

On this evidence, and an inspection and recount of the ballots, in the precincts in which a recount was demanded by the contestor, the finding and judgment of the court was for appellee. The difference in the recount by the court, and that returned by the judges from the several precincts, after deducting from appellee ten votes in a precinct in which it was alleged in the answer, and stipulated by counsel, there was a clerical error of this number of votes in the computa tion made by the canvassing board of the returns from this precinct, was such that appellee was declared elected by a plurality of 138 votes over the appellant. In the five of the six precincts which affected the result on recount, numbered 43, 52, 58, 59 and 60, the loss to appellant, as compared with the returns was respectively fourteen, nine, thirty-eight, sixty-one and thirty-one; while in the remaining one of these six precincts, being number 56, his gain was four; the result being a loss to him of 149 votes in these precincts. In the five of these six numbered 43, 56, 58, 59 and 60 the gain of appellee, in comparison with the returns, was respectively two, twenty-one, thirty-four, twenty-two and sixteen, with a loss of one vote in number 52, making his total gain in these precincts ninety-four, and his net gain in the six, over appellant, 243. The court also found that the ballot boxes of the precincts which were specified in the statement of contest, together with the ballots therein, had been con-tinuously in the custody and control of the proper officers from the time of the completion of the canvass and counting by the precinct officers down to the time of the recount by the court, and that beyond all reasonable probability, the bal-lots from these precincts had not been changed or altered, or in

any manner tampered with between the time they were originally counted and the time they were recounted by the court.

The contention of appellant is that under the evidence it was clearly established that the ballots, after the canvass was made by the election judges, were changed by markings and crosses in the emblems and body in such manner as to affect the vote between the parties to this contest; which accounts for the difference between the recount by the court and the returns made by the election judges.

It is a primary rule of elections that the ballots cast by the voters constitute the best, and are the primary, evidence of the intention and choice of the voters, when it is made to appear, from the identical ballots cast, that a candidate for a particular office has more ballots than another; but in order to have this effect, it must be shown that the ballots have been duly preserved in the manner provided by statute, and protected from any unauthorized intermeddling or tampering: *Andrews v. Judge of Probate*, 74 Mich. 278; *Davenport v. Olerich*, 75 N. W. Rep. 603; and the burden of proof is on the contestor to show that they have been so preserved, and have not been tampered with. *Coglan v. Beard*, 67 Cal. 303; *Davenport v. Olerich, supra.*

The fact that ballots have been in the custody of the proper officers from the time of canvass down to a recount is only *prima facie* evidence of their integrity, not conclusive. *Ferguson v. Henry*, 64 N. W. Rep. 292.

The rule that as between the ballots and the canvass of them the ballots control, has no application where the ballots have been tampered with. *Dennis v. Caughlin*, 44 Pac. Rep. 818.

The court, upon recount, must be sure that it has before it the identical and unaltered ballots which were deposited by the voters, before they become controlling, as against the certificate of the result of the canvass of the election officers. *Kingery v. Berry*, 94 Ill. 515.

It is also held that where the evidence discloses that the care and custody of the ballots has been such that they may

have been tampered with, they are not admissible in evidence, unless there is evidence tending to prove that they are in the same condition as when canvassed. *Martin v. Miles*, 40 Neb. 135. This doctrine, followed to its logical conclusion, would lead to the further one that if the evidence, on recount, establishes that they are not in the condition cast, they must be rejected.

If the evidence in the first instance is sufficient to admit of a recount of the ballots, it is still proper to consider any evidence tending to impeach their integrity. *Kreitz v. Behrensmeyer*, 125 Ill. 141.

Where there is a substantial conflict in the evidence, the general rule is that an appellate court will not review it, with a view to determine its sufficiency to support the finding of the trial court. But to this rule there are well recognized exceptions, as where the finding is the result of bias or prejudice, mistake or misapprehension, or misconception of the legal effect of the evidence; or where there is none. *Beulah Marble Co. v. Mattice*, 22 Colo. 547. Nor can a judgment but slightly supported by the evidence, and manifestly against its weight, be permitted to stand. *Mitchell v. Reed*, 16 Colo. 109.

Measured by these rules of law, the evidence heard by the trial court will be considered. It is not questioned but that the ballots were marked and crossed in such manner when counted by the court that the count then made, as determined by such marks and crosses alone, was correct; and the real question is, what does the testimony actually establish regarding the integrity of these ballots? If it establishes that they have been tampered with, or if it is not clear that they were in the same condition when recounted by the court as when canvassed by the precinct officers, then the judgment below cannot stand. It appears, that from the time of delivery, the ballot boxes had been in the custody of the proper officer; that so far as he and his employees knew, their contents had not been disturbed or tampered with. The judges called, stated that so far as they could see, the boxes exhibited no change, or any appearance of having been opened. The evi-

dence, however, was of but little weight in the light of the statement of the trial judge, from which it appears that the construction of these boxes was such that they could have been opened, the ballots removed, again replaced, the boxes relocked, and yet it would have been impossible to detect, from an inspection, that they had been opened. As against the mere passive and negative evidence of the county clerk and his employees, and the physical appearance of the boxes, there is presented the clear, positive and uncontradicted testimony of the judges, clerks and others called by appellant, to the effect that the count made was correct; that ballots doubly marked, when counted by the court, were not so marked when counted by the precinct canvassers; that no ballots were counted for either of the parties to which they were not entitled, and none omitted with which they should have been credited. To rebut this there is not a statement from the lips of a single witness called, that even one mistake was made in the original canvass, or that a single ballot was improperly counted.

It is understood from the argument and record that the reduction in the vote of appellant, as determined by the court, in comparison with that determined by the precinct officers, was due almost entirely, if not altogether, to the fact that on recount of the vote in the six precincts above mentioned, ballots were found to the number of 153 doubly marked either in the emblems or in the body, in such manner as to nullify the vote for treasurer. What appears strange, is that on each of these ballots a cross was made either opposite the name of appellant, or an emblem, which would count as a vote for him had not a cross also been placed either opposite the name of another candidate for treasurer, or opposite an emblem, which nullified the mark in his favor. It is also worthy of notice that in four of these six precincts the loss to appellant, in this way, was respectively fourteen, thirty-eight, sixty-one and thirty-one votes, in the face of the evidence of the judges, clerks, watchers and others present when the precinct canvasses were made that they were correct, and that no such

doubly marked ballots were seen or counted for candidates
for treasurer. It is also worthy of notice that in these same
precincts the gain for appellee, on recount by the court, was
respectively two, thirty-four, twenty-two and sixteen, or a
change, as returned by the precinct officers, of respectively
sixteen, seventy-two, eighty-three and forty-seven votes, as
between the parties to this action; and yet not a friend, enemy
or partisan of either is found who states that a mistake of a
count of one vote was made in either of these precincts.
That all of those present in the capacity of watchers or con-
stables were so obtuse as to permit mistakes in such number,
and in such manner, to occur in their presence, to detect and
prevent which was the special business for which they were
engaged, is a remarkable circumstance, to say the least.
Again, that such mistakes and errors could have occurred in the
canvass by the precinct officers, and escape notice or detection
by every one present, when the number of these errors as found
by the court is considered in connection with the number of
votes cast in such precincts, is altogether unreasonable and
improbable. In precinct number 58 the total vote for treas-
urer, as between these parties, was 309; or, as found by the
court, 305; and a comparison of the official returns, with the
count by the court, discloses that if the former was not cor-
rect, appellant was credited with thirty-eight votes more than
he was entitled to, and appellee with thirty-four less; or, mis-
takes were made by the precinct officers, to the detriment of
appellee, to the number of seventy-two votes. In number 59 a
like comparison shows the loss to appellant to be sixty-one
votes, and a gain to appellee of twenty-two, or a mistake in
the official count which resulted in depriving appellee of eighty-
three votes; and this great number of errors in a precinct where,
according to the official count, the total number of votes cast
for both was only 227; or, as found by the court, 188; or,
taking the six precincts specially under consideration, it is
found by similar comparison that in the official canvass of
1511 votes for treasurer, or in canvassing only 1356 votes for
this office, as found by the court, the errors made by the

precinct officers were 243.   From these precincts, or several
of them at least, more or less ballots were returned defective
on account of having been so doubly marked that they could
not be counted for any candidate, from which it is evident
that the judges were alert, and understood fully the effect
on ballots so marked; while in precinct 43, according to
the evidence of a witness called by appellee, controversy
arose over one ballot which was in some manner doubly
marked, but which it was finally decided was not so marked
that the marks conflicted, and the witness does not intimate
that this decision was not correct, which further demonstrates
the care which these precinct officers were exercising in the
discharge of their duties.

From this testimony it is clear that the judgment of the
trial court was manifestly against the weight of the evidence
in the case; and that the finding of the court regarding the
integrity of the ballots must have been based alone upon the
testimony relative to the care and custody of the boxes and
their condition when produced in court, which are but mere
circumstances when considered in connection with the over-
whelming and uncontradicted testimony regarding the correct-
ness of the official count.   The evidence establishes that these
boxes have been tampered with; or else it must be conceded
that all the witnesses who testified regarding the official count
have deliberately committed perjury.   The circumstances of
the care and custody of these boxes is wholly insufficient upon
which to base any such conclusion, when the evidence further
discloses there was a possibility they could have been opened
and the ballots altered by evil disposed persons; and though
such possibility is not of itself sufficient to destroy the integ-
rity of these ballots, this possibility, when coupled with the
evidence relative to the official count, demonstrates that some-
one has embraced the opportunity thus offered and changed
the ballots in these precincts.

The burden of proof was on the appellee to show noninter-
ference with the ballots, and that upon recount they were the
identical unaltered ballots deposited by the voters.   It is not

sufficient that a mere probability of their security and inviolability was proven; but these facts must have been shown with a reasonable degree of certainty. *Dailey v. Livingston*, 79 N. Y. 279.

Under the system of ballots adopted in this state it is extremely easy to commit fraud after the count by the precinct officers, if access be had to the boxes and contents, for the reason that in order to change a ballot a mere stroke of the pen is all that is required ; and it is therefore necessary that these rules relative to the integrity of the ballots, when exhibited for recount, be strictly applied, and that the proof of error and mistake on the part of the precinct officers be clear, before a recount will control, as against the official returns.

It is urged, however, that the finding of the court that appellee was entitled to ninety-five more votes in these precincts than he was credited with by the election officers, is corroborative of the claim of the contestor that the precinct officers committed errors and mistakes in the count of the ballots ; but this finding, based as it is upon ballots taken from boxes in which others were found that had been tampered with, is of but little weight against the clear and positive testimony that no such mistakes occurred ; and besides, it appearing from the evidence that other ballots from these boxes have been altered, it could not be said, with any degree of certainty, that the ballots upon which the appellee relied for votes in his favor, upon the recount, were not likewise changed, and the integrity of all the ballots therefore stands impeached, and they cannot be considered controlling as against the official returns.

A number of the ballots introduced on the trial of the case below have been transmitted with the record for examination by this court, from an inspection of which the peculiar markings of these ballots is disclosed, a few examples of which will be noticed. In many instances the emblems only were doubly marked, and in cases where the marks would indicate a vote for appellant, were it not for one opposite another emblem, the difference between the two is so evident, the conclusion must be that they were not made by the same hand ; and as further

supporting this conclusion, the similarity of the crosses oppo-site emblems nullifying those opposite the emblems of the party of which appellant was a candidate, is so striking and manifest that the conclusion is unavoidable they were made by the same person. In other instances, the voters have indicated their choice by placing a cross opposite the name of each candidate for whom they wished to vote, evidently fully understanding and comprehending how to vote in this manner; and yet, after an exhibition of this intelligence, another cross is found opposite an emblem which nullifies, more or less, all those in the body of the ticket—markings which are so inconsistent with each other that it is not probable they were made by the same person; and again, the similarity of the crosses in the emblems in these instances with those above noticed, is clear and evident. In other instances, where the voters sought to mark their ballots by placing a cross opposite the name of each candidate for whom they intended to vote, and for this purpose placed a cross opposite the name of one candidate for each office to be filled, except in the case of county treasurer, where, according to the marking, they voted for two candidates for this office—another example of improbable acts by those who apparently understood how to mark a ticket.

From the face of these ballots, therefore, as well as the clear weight of the oral testimony, it is manifest that the ballots have been changed and altered since they were counted and canvassed by the precinct officers; and the conclusion therefore is that the official returns must control, from which it appears the appellant was duly elected.

The judgment of the county court is reversed, and the cause remanded, with directions to render judgment that appellant was duly elected, and is entitled to the possession and control of the office, upon qualifying, as by law required. Judgment is also directed that appellant recover his costs to be taxed, as in other cases.

*Reversed.*

CAMPBELL, C. J., dissenting.

Before the handing down of the foregoing decision, I had no time to prepare an opinion giving my reasons for the dissent then announced. An attentive reading of the voluminous record, made before the majority opinion was filed, then satisfied me that the findings of fact of the trial court found support in the evidence, and this conviction is strengthened by a further careful examination of the record, made since that time. These findings, however, have been disregarded by my associates upon the ground that they are manifestly against the weight of the evidence.

The general rule, so often announced as to become firmly fixed in our appellate practice, is that where there is a substantial conflict in the evidence, the verdict of the jury, or the findings of the trial court, will not be disturbed; even if the appellate tribunal should believe the preponderance to be against the findings, and, if sitting as a trier of facts, would have arrived at a different conclusion. To this rule, however, there are recognized exceptions, and upon one of them, just mentioned, the majority of the court have based their decision.

At the outset it is pertinent to observe that the bill of exceptions consists of 1086 folios, and the abstract of the record covers 490 printed pages, while there are many accompanying exhibits not included in either. From this it might naturally be inferred that the review of the evidence by the learned writer of the opinion does not fully set forth its true import. It would be improper to criticise it as cursory, but, to my mind, it is not adequate. But even from the *résumé*, made, as it is, for the purpose (proper enough) of justifying a course out of the ordinary in courts of review, I think enough appears to demonstrate the failure of the attempt. My brethren were confronted with certain specific findings of fact, some of which are here set forth in substance as follows:

"Fourth. That the ballot boxes, and each and every of

VOL. XXV—21

them, of the precincts aforesaid, together with the ballots contained therein, were continuously, from the time of the completion of the canvass and counting of said ballots by the respective judges of the said several election precincts, down to the time of recounting said ballots as hereinafter mentioned (recounting by the court), in the possession of and under the immediate charge of the duly constituted officers required by law to have and keep possession and custody thereof; and that beyond all reasonable probability the said ballots so inclosed and sealed in each and every of the said boxes of each and every of the said precincts, had not been changed or altered, or in any manner tampered with between the time the said judges of the said several election precincts canvassed and counted the same and the time the same were recounted by this court in this action as hereinafter mentioned; and that beyond a reasonable probability each and every of the said ballots so canvassed and counted by the said election judges as aforesaid, and at the time they were so canvassed by said election judges were in identically the same condition as to marking of a cross or crosses on said ballots, both at the emblems and in the body of the tickets opposite each candidate's respective name thereon printed, as they were at the time the same were recounted by the court in the trial of this cause."

"Seventh. That the judges of election committed error and mistake in the canvassing and counting of the votes cast for contestor, at said general election, in their respective precincts, in that they failed to count for contestor a total of 108 votes cast for him, and that in one precinct said judges counted for contestor one more vote than ought to have been counted for him, and in another precinct counted one more vote for said contestor than ought to have been canvassed and counted for him."

"That the total number of votes, after deducting the said two votes so improperly counted for contestor, and which were cast for, and which should be counted for, and which the court upon said recount did count for, contestor, is 106

votes, which should be added to the total number of votes counted for said contestor by the board of county canvassers as aforesaid, making the aggregate of the vote of said contestor, in all of the precincts of the said county of El Paso, cast for him at the general election aforesaid, the number of 6,472 votes.

"That the judges of election of the several precincts hereinbefore specifically set forth made and committed mistakes and errors in canvassing and counting the votes in their respective precincts in that they canvassed and counted for contestee a total number of 157 votes, in excess of what was actually cast for him in said respective precincts, which number should be, and were by the court on such recount, deducted from the total number of votes canvassed and counted by the said board of county canvassers.  And that the total number of votes cast for contestee at said election, after making the additions and deductions aforesaid, together with the ten votes in precinct 13, which by error and mistake were not canvassed and counted for contestee by the board of county canvassers as aforesaid, was and is 6,334 votes.

"That upon the recount taken and had, as aforesaid, of all the votes cast both for contestor and contestee in all of the precincts of the said county of El Paso, said contestor, Steinmetz, has a plurality over the contestee, Rhode, of 138 votes."

In the face of such specific findings an appellate court might well pause and long hesitate before treating the action of the lower court as entitled to no consideration.  Not the slightest claim of bias or prejudice of the county judge is made by counsel for appellant, nor is any such intimation found in the opinion of this court.  His error is said to be merely one of misjudgment of the weight and sufficiency of testimony.  Let us briefly see what the evidence shows.

Contestor (appellee here), by the testimony of all of those persons having possession of the ballot boxes, showed that the ballots, from the time they left the custody of the judges of election, had been guarded and preserved strictly, as the statute requires, and this I do not understand to be seriously

questioned by the contestee. By the election judges in each of the precincts in question it was shown not merely, as the opinion states, "that, in their judgment, the respective boxes, so far as they could observe, were in the same condition as when locked and sealed after the canvass of the ballots was completed," but also that the position of the ballots themselves in the boxes was in the same condition, and did not give any appearance of having been removed from the boxes, or in any manner interfered with.

Surely this proof authorized the trial court to open the boxes and count the ballots. Indeed, up to this time the contestee had not suggested any infirmity of the ballots, and it was not until after the recount was had which showed a mistake on the part of the election judges that the contestee, for the first time, attacked their integrity, and thereafter introduced the impeaching evidence, as pointed out in the opinion.

Much stress is laid upon the statement that the witnesses introduced by contestor to rebut this evidence by the election judges did not swear so positively to a miscount of the ballots, or that improper credit was given to any candidate, or that some mistake was made at the count, as contestee's witnesses did that, by no possibility, could they be mistaken in the official count. The trial occurred a month or more after the election, and while it is true that there is a difference in the positiveness of the respective witnesses, I fail to discover in that any special ground for attributing infallibility to memories so retentive that those so gifted with them are able to relate with absolute definiteness just what particular marks, and how many, were, at the time of the official count, on certain ballots then selected indiscriminately from the whole number in the box. Indeed, the fact that some of the contestee's witnesses exhibited such remarkable memories as to retain a distinct recollection of so many small details when nothing occurred at the time to impress them on their minds, does not operate to commend their veracity as beyond question, or stamp their testimony as entitled to controlling weight. Moreover, as I read the record, some of contestor's witnesses on rebuttal tes-

tified to such a careless method in counting as seriously to weaken the testimony of the election officers, and testified to facts tending directly to contradict contestee's evidence touching the correctness of ·the official count.

Unquestionably, as already stated, the showing made by the contestor as to the care of the ballots made them the primary and best evidence of the result of the election, and the burden then shifted to the contestee to show that the ballots as recounted at the trial were not as cast by the voters. This he attempted to do by the testimony of the judges and clerks, and aside from this there is not a particle of direct evidence that the ballots, as recounted, were not the same as cast. It is, indeed, only by inference from the testimony of the election officials that it can be said that the ballots, as recounted by the trial court, were not in the same condition as when counted by the former; and if the testimony of the custodians of the ballot boxes is only "negative and passive" testimony of their integrity, so, also, is the testimony of the judges and clerks "negative and passive;" because the conclusion that the ballots have been tampered with is but an inference from their testimony that they made no mistake in the count; and this testimony is merely corroborative and confirmatory of their affidavits attesting the accuracy of their official count and attached to the return thereof. I say this conclusion of the majority that the ballots were tampered with after they reached the clerk's office follows, if at all, solely from the testimony of the election officers, for there is nothing else in the record that rises above unfounded suspicion that in any way impeaches the integrity of the ballots.

Reference, however, is made in the. opinion to the fact that in the vault where the ballot boxes were kept were a number of keys that might have been used for opening the boxes; and that the combination lock of the vault might have not been altered, after the acting county clerk entered upon his official duties, so that former clerks or their deputies, who knew the combination, might have had access thereto, and so have tampered with the ballots. But unless there was evidence

in the record of an opportunity to some one to use these keys and unlock these boxes, and that the combination of the vault was not changed and that some prior officials knew it and had access to the vault,—which there is not,—these circumstances have no weight whatever, and are not entitled to the dignity even of "negative or passive evidence."

It is, however, in commenting upon this phase of the case, and in comparing the evidence by which the respective parties supported their respective contentions, that the majority have fallen into what seems to me serious error. They characterize the evidence of contestor as "negative and passive;" and that of the contestee as "positive;" and say that, as a matter of law, the former must therefore yield to the latter. It might not be a difficult task, and I think it would not be, to show that no such distinction can be drawn, but that both kinds of testimony are of the same class. But if that produced by the contestor is negative and passive, what other kind of evidence could ever be produced upon the issue presented? It would be impossible to prove the integrity of the ballots by any other kind of testimony than that which this record discloses contestor produced.

The physical condition of some of the ballots which have been brought up as original exhibits, to my mind is susceptible of no such construction as that given it in the opinion. If they have been tampered with, and forgeries have been committed with respect to them, while in the custody of the county clerk, it is not likely that these crimes were committed by a bungler; yet the writer of the opinion says that the crosses placed upon these ballots have been done in such a way as clearly to reveal the fact that the same hand did not place the forge, that placed the genuine, marks upon them, because there is such a dissimilarity between the two. This may, to some minds, be a strong argument in support of the conclusion that forgery has been committed; but an equally strong argument could be made if the forged crosses had been made so nearly like the genuine ones as to have deceived persons not skilled in detecting forgeries; so

that I regard the present physical condition and appearance of the original ballots as of no weight whatever upon the controverted issues, or, if of any weight, that they are just as susceptible of the construction that no forgery was committed as that it was. Besides, the observation of the court applies to only a very few of the ballots in question; and, with respect to the large majority of the ballots, if the reasoning of the opinion is sound, precisely the opposite conclusion must follow if their physical appearance is to control.

Another circumstance which seems to have weighed with the court in arriving at its conclusion is that it seems unreasonable to believe that the judges of election could have made so many mistakes as the recount indicates that they did. These errors may be somewhat surprising upon the assumption which the majority apparently have indulged, that no mistakes or wrongs were committed by the election officers; and were there nothing else in the record that bears upon this question the circumstance might be entitled to some weight; but it clearly appears from this record, and the learned counsel for appellant have not in any way attacked the findings of the trial court thereupon, or in any way pointed out evidences of fraud in connection therewith, that the judges and clerks of election in these six precincts neglected, failed or refused to count for the contestor 106 votes which were cast, and should have been counted, for him. Now, if these officials failed to count for contestor 106 votes which were cast for him, it is not a very great strain upon credulity to believe from the testimony in this case that they not only might have, but actually did, count for the contestee 157 votes which were doubly marked, and should not have been counted for any candidate. .

The majority give to the testimony of the election officials greater weight than they do to that of the county clerk and his deputies, without considering upon that point this established failure of the judges to count 106 votes that were cast for contestor, and then say that the uncontroverted proof of this failure is not significant because the testimony of the

election officers which, as already stated, only indirectly and inferentially is to the point, satisfies them that the ballots have not been properly preserved. It appears from this record that on the official ballot of El Paso county were printed about twenty different tickets, that it was a complicated thing even for the most intelligent person to understand. Apparently the argument of my associates proceeds upon the supposition that voters in these six precincts intended to vote only straight tickets, and if the ballots show any crosses placed in the body, and not in the margin, this is a suspicious circumstance. There is nothing in the record to sustain such an assumption; and a bit of evidence that has not yet been commented upon is quite significant in this connection. The uncontradicted proof by the election officers themselves is that, in one precinct alone, not included in the six under consideration, they found about twenty-five doubly marked ballots, which they did not count, and so returned them to the county clerk as the statute requires. That fact is overlooked, and my brothers attach to it no importance. But if in one precinct twenty-five voters thus nullified their votes when they attempted to put a cross opposite names in the body of the ballot, why should similar mistakes in other precincts be regarded as suspicious, especially, when the voters were confronted with an official ballot so complicated and confusing as to embarrass an expert who sought to vote other than a straight ticket.

But for the purpose which I have in view, it is not at all essential that I should show that the preponderance of the testimony is in favor of the contestor, nor do I express an opinion, one way or the other, upon it; but if I have succeeded, as I think I have, in showing that there is a very substantial conflict in the evidence, then it follows that this court should not set aside the findings of fact. To say the least, this record presents a conflict in the evidence from which equally candid minds might honestly draw different conclusions. The trial court drew one; while the majority of this court drew another.

The principal reason, however, that prompts me to write

this dissenting opinion is that I regard the precedent which this case will establish in our state as one dangerous to the purity and integrity of the ballots.   If any such distinction is valid as that drawn between the different kinds of evidence by which the parties here have supported their claims, then no matter what kind of fraud and corruption judges of election may commit, their work must stand, if they back it up by what the majority of this court call "positive evidence;" because no amount of so-called "negative and passive" evidence of the due preservation of the ballots can for a moment be permitted to stand as against the "positive testimony" of men who may have committed the most flagrant crimes against the purity of the ballot, even though a trial court may believe the election officers are perjuring themselves to cover up their frauds; and that the county clerk and his deputies are telling the truth as to the care of the ballots.   If such is to be the rule, then if we may be permitted to suppose that in any particular county the county commissioners determine to secure the election of any particular ticket, all they need to do in order to accomplish that end is to appoint shrewd and dishonest judges of election, who, in turn, will appoint as clerks men to carry out their designs; and the will of the voters can be thwarted, and any result that is desired may readily be obtained; for it is a fact (of which courts may well take judicial notice) that it is as easy for judges and clerks of election to commit fraud under the Australian ballot act as for the county clerk to tamper with the ballots after they reach his custody, or to permit others to do so.

Upon the legal questions involved the authorities are all one way, and I do not question the soundness of the abstract legal principles laid down; but the very cases cited in the opinion, when properly considered, wholly fail to justify the action here taken.   I venture the assertion, based upon an examination of all the cases referred to as well as others not cited, that no case can be found in the books where, for such a reason as is given in the majority opinion, an appellate tribunal has set aside the findings of a jury or trial court

based upon so strong a showing as this record presents of the care of the ballots after they were surrendered by the election judges.

In support of the conclusion reached, the opinion cites *Martin v. Miles*, 40 Neb. 135, and *Davenport v. Olerich*, 73 N. W. Rep. 603. Even a cursory examination of those cases shows that the reason for rejecting as evidence the official ballots was that they had been most carelessly and negligently kept, and that frequent opportunity had been given for an abstraction and alteration of the same by large numbers of people; and, indeed, in neither of the cases was anything like the strict care exercised concerning them that the statutes required, or such care as confessedly the county clerk in the case at bar took of the ballots delivered to him.

Upon the direct question with which the opinion in this case deals is a case not referred to in the foregoing opinion,—that of *Furguson v. Henry*, 95 Iowa, 439, and it is directly in conflict with the conclusion reached by my brethren. I quote literally from the opinion:

"Contestant states, as a proposition to be considered under this ruling of the court, the following: 'Where it is shown that the ballots have been preserved and protected, as the law provides, and there is evidence offered tending to show that the ballots have been changed, can the court, as a matter of law, ignore the ballots, and say that no issue of fact is tendered for the jury to pass upon?' The incumbent declines such a proposition, and states the following as the one arising on the record: 'Where there is some evidence tending to show that the ballots have been preserved as required by law, and there is abundance of uncontradicted evidence proving beyond doubt that the ballots have been tampered with, altered and changed since they were canvassed and counted by the judges of election, is it not the duty of the court, as a matter of law, to ignore the ballots, and direct the jury to return a verdict for incumbent?' This difference of opinion as to what question properly arises comes from different views as to the effect of the evidence offered to impeach the verity of the ballots

put in evidence by contestant. This evidence was mainly, if not entirely, by clerks and judges of the election boards in the different precincts, and was of their recollections as to the different ballots shown them having been voted at the election, either at all, or as they then appeared. This evidence was as to some twenty-six ballots, and as to twenty-three of them it is said that the evidence is uncontradicted and conclusive of their being changed. It is because of this conclusive character of the evidence that the incumbent relies upon the proposition stated by him as the correct one. We do not concur as to the evidence being so conclusive. We think, as to the character of these particular ballots, the evidence is in conflict. * * *

"It seems to us, then, that the proposition to be considered is substantially this : Where ballots are admitted in evidence upon preliminary proof, and their genuineness is questioned by oral evidence, does the oral evidence, as a matter of law prevail, and are the ballots to be disregarded? With the proposition thus reduced, we have no reason to think there is a difference of opinion as to the law. The oral evidence has certainly no such effect. *It merely presents a question for the jury as to the genuineness of the ballots.* If the ballots are found to be not genuine, the effect is to be determined by rules of law applicable to the situation."

In my judgment this case is directly in point, and the opinion is well reasoned, and is authority for the proposition for which I contend here, viz : that there was such a substantial conflict in the evidence as that an appellate tribunal should not, for a moment, think of disturbing findings of fact made by a jury or trial court in passing upon it. In the case at bar, the county judge saw and heard the witnesses testify, and was much better qualified to pass upon their credibility than we are. Therefore, I think it was wrong for this court to disregard his findings and substitute its judgment for his, and pursue the unusual course, in a case like this, of ordering a judgment for the contestee. Notwithstanding this con-

clusion, I am of the opinion that the judgment should be reversed, for reasons which I proceed to state.

The law requires, when a voter has prepared his ballot, that one of the judges shall mark thereon its number and turn down and seal the corner thereof so as to conceal the number, which corresponds to that opposite the name of the voter in the poll book, and the ballot thereupon shall be deposited in the ballot box. After the ballots in controversy here were taken from the ballot boxes by the county court and counted, the contestee made the claim, to establish which he offered the testimony of the election judges, that the ballots recounted were not in the same condition as when cast, and then asked of the court that the seal of the ballots should be broken and the numbers thereon exposed, so that he might summon the electors casting the ballots to testify as to whether or not any changes had been made therein. Upon objection of contestor the court refused to break the seals, upon the ground that this would violate the secrecy of the ballot, and that neither the constitution nor the statutes of the state permitted it to be done, except in a case where an illegal ballot was cast.

Section 8 of article 7 of the constitution provides that "in all cases of contested election the ballots cast may be counted, compared with the list of voters, and examined under such safeguards and regulations as may be prescribed by law." But the contestor claims that under the statute of this state (Laws of 1885, p. 198, sec. 19; 1 Mills' Ann. Stats. sec. 1679) passed to carry out the provisions of the constitution, the right to open the seals of ballots applies only to those cast by illegal voters, and not to those in respect to counting which mistakes are made.

While appreciating the force of the objection of contestor, and bearing in mind the rule that a voter will not be allowed to testify that he intended to vote for some one other than the person for whom his ballot was in fact cast, whether by mistake or otherwise, still I am of opinion that, under the constitution and statutes of the state, the seal of a ballot may be broken, not only where the ballot has been first proved to

be cast by an illegal voter, but in a proper case, where a sufficient showing has first been made, of a mistake in the official count, and an opportunity given to the voter who cast it to testify, if he elects to do so, whether or not any changes have been made therein.    There was before the county court, upon the one hand, the evidence of the due preservation of the ballots, and, upon the other, the oral testimony of the election officers that the ballots as cast were different from the ballots as recounted in the court.    This raised a most substantial conflict in the testimony that was peculiarly within the province of the county court to determine; and if the voters who cast these ballots were willing to be sworn, their testimony might have been of such a character as clearly to show whether or not the ballots had been tampered with.    A most grievous crime has been committed against the purity of the ballot by tampering with the ballot boxes after the official count, or glaring and inexcusable errors, or crimes, committed in the official count, for which the guilty parties should be punished.    A large number of witnesses testified to the due care of the ballots by the county clerk.    Judges and clerks of election testified that the marks on these ballots when recounted were not there at the time of the official count. It was therefore quite appropriate that the voters casting the ballots in controversy should be called and given an opportunity to testify upon the issue thus presented.    But the order of this court directing a judgment here for contestee, thereby ending this election controversy, precludes the possibility of ever obtaining this most satisfactory testimony of the electors, for it is only in contested election cases that the secrecy of their ballots may be revealed.

For the foregoing reasons, while clearly of the opinion that it was error to enter a judgment here in favor of the contestee, I believe that the judgment should have been reversed and the cause remanded for a new trial in accordance with the views herein expressed.