ATKINSON, APPELLANT, *v.* ROOSEVELT COUNTY ET AL.,
RESPONDENTS; R. J. MOORE, INTERVENER AND RESPOND-
ENT.

(No. 5,481.)

(Submitted June 9, 1924.   Decided July 10, 1924.)

[227 Pac. 811.]

*Injunction—Elections—Location of County Seat—Fraud—Mis-
conduct of Officers—Burden of Proof—Polling Place at In-
dian Trading Post — Statute Directory — Corrupt Practices
Act—Findings—When Conclusive—Record on Appeal—Bills
of Exceptions.*

Appeal from Order—Absence of Bill of Exceptions from Record—
Review of Evidence.
1.   On appeal from an order (to dissolve temporary injunction)
the transcript of the testimony, certified by the trial judge, the
clerk and the stenographer of the court as correct, but not in-
corporated in a bill of exceptions, may, under section 9745, Re-
vised Codes of 1921, be considered in determining whether there
was sufficient evidence to warrant the order.

Appeal from Judgment—Review of Evidence Without Bill of Excep-
tions Unauthorized.
2.   Under section 9390, Revised Codes of 1921, the appellant
from a final judgment desiring to have the proceedings at the
trial reviewed, must have them incorporated in a bill of excep-
tious; if not so incorporated, the appeal may be dismissed.

County Seat Elections—Invalidity—Injunction—Burden of Proof.
3.   Plaintiff in his action to enjoin the removal of a county seat
on the ground of the invalidity of the election has the burden of
proving its invalidity by a preponderance of the evidence, and
on appeal he must show that the evidence clearly preponderates
against the trial court's findings, the supreme court in entering
upon a consideration of the appeal indulging every presumption
of their correctness.

Equity—Conflict in Evidence—Findings—Conclusive on Appeal.
4.   Findings of the trial court will not be disturbed on appeal
where the evidence on the determinative questions involved is in
substantial conflict.

Elections—May be Set Aside, When Only.
5.   An election in a given precinct must not be set aside merely
because there was fraud or misconduct on the part of the election
officers, but only when it is impossible from any evidence ob-
tainable to ascertain the true result.

Same—Setting Aside—Casting of Illegal Ballots—What Contestant must Show.

6. Plaintiff in an election contest claiming the casting of illegal ballots must bear the burden of not only showing their illegality but also that they were cast for his opponent, to enable the court to make the proper deductions and thus to arrive at the correct result. (Apportionment rule adopted in *Heyfron* v. *Mahoney*, 9 Mont. 497, criticised.)

Same—Election must Stand Unless Sufficient Illegal Ballots Found to Change Result.

7. Unless contestant can prove that illegal ballots in number sufficient to change the result were cast, the election must be sustained.

Same—Electors not to be Disfranchised for Improper Acts of Officers of Election.

8. Electors may not be disfranchised simply because the officers conducting the election failed to perform their duties properly.

Same—Polling Place at Indian Trading Post—Statute Directory— Election to be Upheld, When.

9. An election held at an Indian trading post will not be declared invalid as in violation of section 552, Revised Codes of 1921, forbidding the establishing of a voting precinct at an Indian agency or trading post, the statute being directory merely, and it appearing that no person in the precinct was deprived of his vote by reason of the election having been held there, that the election was honestly and fairly conducted, and that all electors believed their ballots had been legally cast.

Same—Corrupt Practices Act—What Does not Constitute Violation of Act.

10. *Held*, that if the Corrupt Practices Act applies to county seat elections, the finding of the trial court that contestant failed to prove fraud and corruption on the part of partisans of the successful candidate, in furnishing sandwiches, cake, coffee, *etc.*, at a public meeting and dance a few days before election, and supplying oil and gasoline for automobiles to convey electors to polling places during a snowstorm, no discrimination being made between those favoring one place or the other, and that such actions did not affect the result, was sustained by the evidence.

Error—Courts must Disregard Unsubstantial Error in Proceedings.

11. Under section 9191, Revised Codes of 1921, courts must disregard any error in proceedings which does not affect the substantial rights of the parties.

Equity—Appeal—Admission of Incompetent Evidence—Presumptions.

12. In an equity case it will be presumed on appeal that the trial court, charged with error in admitting incompetent evidence or in reserving rulings on the admissibility of testimony, in arriving at its conclusion considered only the competent evidence before it.

*Appeal from District Court, Roosevelt County, in the Twentieth Judicial District; George A. Horkan, Judge for the Fifteenth District, presiding.*

---

6. Ballots as admissible to impeach election returns, see notes in **Ann. Cas.** 1912B, 682; **Ann. Cas.** 1916B, 490.

[71 Mont. 165.]

SUIT by J. L. Atkinson against Roosevelt County and others, wherein R. J. Moore intervened. From the decree for defendants, and an order dissolving injunction *pendente lite,* plaintiff appeals. Affirmed.

*Mr. C. A. Spaulding* and *Mr. Harrison F. McConnell,* for Appellant, submitted a brief; *Mr. Spaulding* argued the cause orally.

Under the statutes of this state and the decisions construing similar statutes, and the undisputed facts found in this record, it is the contention of appellant that the votes cast in precincts Nos. 2, 3 and 4 should be rejected *in toto,* and that to allow the same as legal votes cast at this election is unjustified and unwarranted. If the statute (Corrupt Practices Act) is to be given an intelligent and intelligible meaning and is to be applied to the conditions here established we find that practically every voter in these precincts had been guilty of "treating" whereby his vote should be rejected. (*Heyfron* v. *Mahoney,* 9 Mont. 497, 18 Am. St. Rep. 757, 24 Pac. 93; *Lloyd* v. *Sullivan,* 9 Mont. 577, 18 A. L. R. 757, 24 Pac. 218; McCrary on Elections, 536, 539, 476, 190, 192; Paine on Elections, 592, 596, 499, 497; 10 Am. & Eng. Ency. of Law, 838, 832, 774; 5 Am. & Eng. Ency. of Ev. 90; 20 C. J. 240–249; *Wheat* v. *Ragsdale,* 27 Ind. 191, 206; *Russell* v. *McDowell,* 83 Cal. 70, 23 Pac. 183; *Tebbe* v. *Smith,* 108 Cal. 101, 49 Am. St. Rep. 68, 29 L. R. A. 673, 41 Pac. 454; *Londoner* v. *People,* 15 Colo. 557, 26 Pac. 135; *Rampendahl* v. *Crump,* 24 Okl. 873, 105 Pac. 201; *Inc. Town of Ryan* v. *Waurika,* 29 Okl. 655, 119 Pac. 220; *Blue* v. *Peter,* 40 Kan. 701, 20 Pac. 442; *Attorney General* v. *McQuade,* 94 Mich. 439, 53 N. E. 944; *McKinney* v. *O'Connor,* 26 Tex. 5; *Knox County Supervisors* v. *Davis,* 63 Ill. 405; *State* v. *Taylor,* 108 N. C. 196, 25 Am. St. Rep. 51, 12 L. R. A. 202, 12 S. E. 1005; *Chamberlain* v. *Woodin,* 2 Idaho, 642, 23 Pac. 177; *Jones* v. *Glidewell,* 53 Ark. 161, 7 L. R. A. 831, 13 S. W. 723.)

The court below erred in holding that the election in precinct No. 31 was held at a place permitted by statute. The election was held at and in the store of Sherman T. Cogswell, contrary to the provisions of section 552, Revised Codes of 1921. At that time Mr. Cogswell was operating this store under an Indian trader's license issued by the federal government upon an application and bond theretofore furnished by him for that purpose. This Indian trading post was located, at the time of the election and for years prior thereto, upon a tract of land embracing substantially 633 acres, the title to which, since 1908, was vested in the government of the United States; this tract was formerly a part of the Fort Peck Indian Reservation; the Indian title was extinguished apparently by the government by purchase in 1908 (Chap. 1, Part 1, Pol. Code, sec. 19 *et seq.,* Rev. Codes 1921), since which time the title has been vested in the federal government. (McCrary on Elections, secs. 89–92; 20 C. J., p. 74, par. 33; 10 Am. & Eng. Ency. of Law, 2d ed., p. 607; *Dailey* v. *Esterbrook,* 1 Bart. El. Cas. 299; *Bennett* v. *Chapman,* 1 Bart. El. Cas. 204; *Morton* v. *Dailey,* 1 Bart. El. Cas. 402; *Burleigh* v. *Armstrong,* Smith El. Cas. 89; *Opinion of Justices,* 1 Met. (Mass.) 580; *Commonwealth* v. *Clary,* 8 Mass. 72; *Sinks* v. *Reese,* 19 Ohio St. 306, 2 Am. Rep. 397; *In re Town of Highlands,* 48 N. Y. St. Rep. 795, 22 N. Y. Supp. 137.)

Since land which has been ceded by the state to the United States for the use of some department of the general government, without any reservation of jurisdiction except the right to serve civil and criminal process thereon, *ceases to be a part of the state,* such land cannot become a voting precinct in the state in which it is situated until it is re-ceded to the state by Congress. (20 C. J. 74, sec. 33.) (See, also, dissenting opinion in *Coleman* v. *Kerr,* 33 Mont. 198, 83 Pac. 393, and *Stephens* v. *Nacey,* 49 Mont. 230, 141 Pac. 649.)

*Messrs. Norris, Hurd, Rhoades & Hallett* and *Mr. H. C. Hall,* for Respondents, submitted an original and a supplemental brief; *Mr. Geo. E. Hurd* argued the cause orally.

Appellant contends that the votes in precincts 2, 3 and 4 should be rejected because of alleged corrupt practices.

None of the authorities cited in this branch of appellant's brief bear remotely upon the matter of rejecting the votes in these three precincts. The rule, however, appears to be clearly and well stated, in harmony with the decisions generally, in *City of Blackwell* v. *Newkirk,* 31 Okl. 304, Ann. Cas. 1913E, 441, 121 Pac. 260: ''Mere intent by the partisan of a candidate to unlawfully influence voters at an election cannot operate to render void the votes of electors who were not influenced and affected by such intent. To hold otherwise would permit a zealous partisan of a candidate, or an unscrupulous opponent, to defeat the will of the electors of any precinct, or of an entire county, by offering a bribe before the election, or by bestowing favors upon some of the voters after they had cast their ballots, although the voters were entirely uninfluenced by the conduct of such persons.

''It is well settled that all votes obtained by paying, giving, or offering to pay or give, anything of value to electors therefor are, upon proper proof, to be rejected by a court in a contest. (Art. 215, McCrary on Elections.) But the votes of those who neither directly nor indirectly participated in the bribery or unlawful agreement, and who are not the recipients of any benefits of the unlawful conduct of him who attempts to influence corruptly any election, are not to be rejected. (*Berry* v. *Hull,* 6 N. M. 643, 30 Pac. 936.)'' (See, also, *Wallis* v. *Williams,* 50 Tex. Civ. 623, 110 S. W. 785; *State* v. *Sullivan,* 44 Kan. 43, 23 Pac. 1054; *Windes* v. *Nelson,* 159 Mo. 51, 60 S. W. 129; *Ferguson* v. *Allen,* 7 Utah, 263, 26 Pac. 570; *Woolley* v. *Louisville S. R. Co.,* 93 Ky. 223, 19 S. W. 595; *Martin* v. *McGarr,* 27 Okl. 653, 38 L. R. A. (n. s.) 1007, 117 Pac. 323.)

Whether treating becomes a violation of the statute depends on the intent with which it is done. If done with the intent to influence the vote of an elector, it is a violation of the statute; otherwise not. And this intent can be ascertained only from the facts and circumstances surrounding each particular case. (*Moonlight* v. *Bond,* 17 Kan. 351; *Umbel's Election,* 231 Pa. St. 94, 80 Atl. 541; see, also, 12 Halsbury's Laws of England, p. 290; *Alesbury Case,* 4 O'M. & H. 59, 63; *Haggertson Division Case,* 5 O'M. & H. 68, 72; *Norwich Case,* 4 O'M. & H. 84, 91; *St. George's Division Case,* 5 O'M. & H. 89, 99; *Great Yarmouth Borough Case,* 5 O'M. & H. 176, 194.)

Since the Indian title was extinguished to the site upon which Cogswell's store, where the election was held, was situated, we are unable to see the pertinency of this branch of appellant's argument. Nothing in the record discloses that Cogswell's store is a government building. On the contrary, it appears to be the property of Mr. Cogswell. It is located on government land pursuant to license from the government. The question of the state's jurisdiction of Indian reservations is not even remotely involved herein. If such question were involved it is the law that such reservations may be included in the political subdivisions of the state for political and governmental purposes. (22 Cyc. 141; *Yellowstone Co. Commrs.* v. *Northern Pac. R. Co. et al.,* 10 Mont. 414, 25 Pac. 1058; *State ex rel. Baker* v. *Mountrail County,* 28 N. D. 389, 149 N. W. 120; *Draper* v. *United States,* 164 U. S. 240, 41 L. Ed. 419, 17 Sup. Ct. Rep. 107 [see, also, Rose's U. S. Notes]; *State* v. *Denoyer,* 6 N. D. 586, 72 N. W. 1014; *Stevens* v. *Thatcher,* 91 Me. 70, 39 Atl. 282; *Webster* v. *Reid,* 1 Morr. (Iowa) 467; *Gay* v. *Thomas,* 5 Okl. 1, 46 Pac. 578; *Millar* v. *State,* 2 Kan. 174; *State* v. *Norris,* 37 Neb. 299, 55 N. W. 1086.) Even if an error was made in fixing the polling place at Cogswell's store, and we do not concede that there was any, such was the error of administrative officers and for their error the electors of this state will not be disfranchised. (*Thompson* v. *Chapin,* 64 Mont. 376, 209 Pac. 1060; *Wells* v. *Taylor,* 5 Mont. 202, 3 Pac.

255; *Heyfron* v. *Mahoney,* 9 Mont. 497, 18 Am. St. Rep. 757, 24 Pac. 93; *Carwile* v. *Jones,* 38 Mont. 590, 101 Pac. 153; *Harrington* v. *Crichton,* 53 Mont. 388, 164 Pac. 537.)  Even if the land upon which Cogswell's store was situated could not be included within the boundaries of the precinct, the election held at such place would not be invalid.  It is to be remembered that this assault is made after the election has been held.  For many years the electors of that precinct have voted in that polling place regularly designated by the only authority which may designate it.  No contention is made that any elector, by the mere fact the polling place was in Cogswell's store, was deprived of his vote, nor was any fraud committed. The courts are almost unanimous in holding an election valid under these circumstances, even if the polling place is outside of the boundaries of the precinct.  (20 C. J. 103; *Smith* v. *Hackett,* 129 Md. 73, 98 Atl. 140; *People* v. *Graham,* 267 Ill. 426, Ann. Cas. 1916C, 391, 108 N. E. 699; *Murchie* v. *Clifford,* 76 N. H. 99, 79 Atl. 901; *Otis* v. *Lane,* 68 N. J. L. 656, 54 Atl. 442; *People* v. *Carson,* 155 N. Y. 491, 50 N. E. 292; *Kerlin* v. *Devils Lake,* 25 N. D. 207, Ann. Cas. 1915C, 624, 141 N. W. 756; *Metzger's Case,* 2 Pa. Dist. R. 301; *Davis* v. *State,* 75 Tex. 420, 12 S. W. 957; *Ex parte Stein,* 61 Tex. Cr. 320, 135 S. W. 136.)

MR. JUSTICE GALEN delivered the opinion of the court.

This is an action in injunction to restrain the defendants from removing the county seat or their offices from the town of Poplar to that of Wolf Point.  The individual defendants named comprise the board of county commissioners and other officers of Roosevelt county.  The case involves the location of a permanent county seat growing out of an election held November 7, 1922, whereat the towns of Poplar and Wolf Point were contenders for the county seat of Roosevelt county. Poplar had been the temporary county seat from November 2, 1920.  On the face of the election returns Wolf Point won by a majority of 192 votes and was duly declared to have been

selected as the site of the permanent county seat. Misconduct on the part of certain of the judges of election, illegal voting, corrupt practices and fraud in several voting precincts are charged.

Upon the filing of plaintiff's complaint Judge C. E. Comer issued a temporary restraining order enjoining the removal or attempted removal of the county seat from Poplar to Wolf Point. Cause, if any existing, was required to be shown, by the defendants in the action before Judge John J, Greene why the injunction should not be continued until final judgment on the merits. A hearing was had pursuant to this order before Judge Greene. Oral testimony was introduced, and at the conclusion of the hearing the court refused to vacate the temporary restraining order and ordered the issuance of an injunction *pendente lite.* Appeal was prosecuted to this court by one of the defendants, George Leeson. Upon such appeal we held that the issuance of a temporary injunction is largely a matter of discretion on the part of the district judge and in the absence of a showing of abuse thereof refused to interfere therewith. (*Atkinson* v. *Roosevelt County,* 66 Mont. 411, 214 Pac. 74.)

Answer was made and filed by certain of the defendants, and R. J. Moore, a resident taxpayer and elector of the town of Wolf Point, asked and was granted leave to intervene in the action. Thereupon he filed a complaint in intervention wherein he traversed the material allegations of plaintiff's complaint, alleged affirmative matter and prayed that the injunction be dissolved and Wolf Point declared to be the permanent county seat. Issue having been joined by reply made to the answer of the defendants and the complaint in intervention, the matter came on regularly for trial on the merits before Honorable George A. Horkan, Judge of the fifteenth judicial district, without a jury. Subsequently, on February 11, 1924, Judge Horkan filed with the clerk of the court his findings of fact and conclusions of law in the cause, which are in favor of the defendants, whereby the injunction was ordered

dissolved. On February 13, 1924, a judgment was regularly signed by Judge Horkan vacating and setting aside the injunction *pendente lite* and decreeing that the county seat of Roosevelt county be removed from the town of Poplar to that of Wolf Point. The judgment was regularly filed and entered February 15, 1924. On February 13, 1924, the plaintiff filed his notice of appeal to this court from the order dissolving the injunction and on February 19, 1924, perfected an appeal from the judgment. The appeal from the order was accomplished on February 22, 1924. By order of this court these appeals were consolidated and permission granted to file a single record. The record comprises ten large volumes, and the errors assigned by plaintiff's learned counsel number 155.

By plaintiff's assignments of error on this appeal the findings of fact and conclusions of law made by the trial court are vigorously attacked upon the following grounds, to-wit:

(1) The recognition of votes of electors in certain of the precincts wherein such electors did not reside; (2) violations of the Corrupt Practices Act in certain of the precincts sufficient to nullify the election held in such precincts; (3) the holding of the election in precinct No. 31, at Cogswell's store, a trading post, contrary to the provisions of section 552, Revised Codes of 1921; (4) giving recognition to the votes cast at Bainville, precinct No. 4, whereat there was, for an appreciable length of time, but a minority of the judges of the election present; (5) illegal recognition given to the election held at Wolf Point in precincts Nos. 23 and 24, notwithstanding there was proof of willful misconduct on the part of the judges of election in knowingly receiving illegal votes; (6) unlawfully sustaining the election held at Bainville in precincts 2, 3 and 4, wherein illegal votes were accepted in favor of Wolf Point and legal votes in favor of Poplar rejected; (7) error in the admission and rejection of evidence; (8) error in refusing to rule on the admission of evidence, the court's rulings having been reserved at the time the proof was admitted; (9) that the court's findings are contrary to

the evidence; (10) that the court was in error in holding the plaintiff to be estopped to challenge the legality of the election held in precinct No. 31 at Cogswell's store, by failure to challenge the same prior to the canvassing of the returns.

At the outset we are confronted with motions made by the [1] defendants and the intervener to strike the record on appeal from the files and to dismiss both appeals. Admittedly there is no bill of exceptions contained in the record. The judgment-roll is properly before us, and question arises as to the propriety of considering the testimony as presented. A transcript of the stenographer's notes of the evidence introduced at the trial and of all of the original exhibits has been filed in this court. Appellant's counsel justifies the record by reference to section 9745, Revised Codes of 1921, which reads in part as follows: "On an appeal from an order, except an order granting a new trial, the appellant must furnish the court with a copy of the notice of appeal of [from] the judgment or order appealed from, and of all papers and evidence used on the hearing in the court below. Such papers, files, and evidence, when certified by the clerk of the court to be correct and accompanied by a certificate of the judge that such records have been used at the hearing in the district court, may be considered on appeal without further identification." The court stenographer has certified that the transcript contains a true, correct and complete record of the testimony and proceedings in the case, as did also the judge and the clerk of the court. Eight volumes thereof are devoted to testimony introduced at the trial running from page 1 to 3098, inclusive. Volume 9 is certified to contain true and correct copies of all of the exhibits introduced at the trial of the cause. Volume 10 is certified by the presiding judge and the clerk of the court to constitute the judgment-roll.

Are we in position, in view of the character of the record before us, to consider and pass upon the several assignments of error grouped as above indicated? We are satisfied that as respects the appeal from the judgment we are not at liberty

so to do, and, as to the appeal from the order, it is necessary for us to determine from an examination of the record whether there was sufficient testimony before the court to warrant its order vacating the injunction. The transcript may be used for the latter purpose since the statute permits it. (Sec. 9745.) It may be that the record is unfair to the defendants, since the testimony was not settled in a bill of exceptions, but, as the statute allows an appeal from such an order, on a record of the character here presented, we are constrained to give [2] recognition to it. But in connection with the appeal from the judgment it serves no useful or other purpose. By section 9390, Revised Codes of 1921, the party appealing from a final judgment, if he desires to have the proceedings at the trial reviewed, must have the same incorporated in a bill of exceptions. And such have been the oft-repeated decisions of this court, most recently in the cases of *Montana Mausoleum Co.* v. *Fava,* 66 Mont. 128, 212 Pac. 515; *In re Bitter Root Irr. Dist.,* 67 Mont. 436, 218 Pac. 945; *Midland Nat. Bank* v. *Hegna,* 68 Mont. 544, 219 Pac. 628; *Weibush* v. *Jefferson Canal Co.,* 68 Mont. 586, 220 Pac. 99. And where requisite papers are not furnished on the appeal it may be dismissed. (Sec. 9747.)

The vote as canvassed and declared by the board of county canvassers is 2,003 in favor of Wolf Point and 1,811 in favor of Poplar, a majority in favor of Wolf Point of 192. The court found that there were 1,987 legal votes cast in favor of Wolf Point and 1,790 legal votes for Poplar, a majority of 197 in favor of Wolf Point.

In the district court the plaintiff assumed the burden of [3, 4] proving the invalidity of the election on the grounds upon which his complaint is predicated in the precincts in which the election is attacked, by a preponderance of the evidence; and on appeal he assumed the burden of showing that the evidence clearly preponderates against the findings of the trial court. We enter upon a consideration of this appeal, indulging every presumption in favor of the findings and

judgment of the court, as is our duty; and if substantial conflict exists in the evidence on what are deemed the determinative questions involved, we will not interfere with the findings made by the trial court. (*Bordeaux* v. *Bordeaux,* 32 Mont. 159, 80 Pac. 6; *Finlen* v. *Heinze,* 32 Mont. 354, 80 Pac. 918; *Delmoe* v. *Long,* 35 Mont. 139, 88 Pac. 778; *Watkins* v. *Watkins,* 39 Mont. 367, 102 Pac. 860, and many other cases.)

"To set aside the returns of an election is one thing; to set [5] aside the election itself is another and very different thing. The return from a given precinct being set aside, the duty still remains to let the election stand, and to ascertain from other evidence the true state of the vote. The return is only to be set aside * * * when it is so tainted with fraud, or with the misconduct of the election officers, that the truth cannot be deduced from it. The *election* is only to be set aside when it is impossible from *any evidence* within reach to ascertain the true result—when neither from the returns nor from other proof, nor from altogether, can the truth be determined. It is important to keep this distinction in mind." (McCrary on Elections, 4th ed., sec. 519.)

The burden not only rested upon the plaintiff to prove [6] illegal votes cast, but to show how they were cast, for if the latter showing is not made by the evidence, how is a court to know what deductions to make from the votes cast? It would be manifestly unjust and unfair to disfranchise 100 or more lawful voters in a precinct because of ten illegal votes cast, simply because the court is unable to determine for which candidate the illegal votes were cast; and in our opinion the apportionment rule given recognition in the case of *Heyfron* v. *Mahoney,* 9 Mont. 497, 18 Am. St. Rep. 757, 24 Pac. 93, is not properly applicable.

Mr. Paine in his work on Elections (page 433) says: "The party who demands the exclusion of votes actually cast and canvassed for his opponent, on the ground of their illegality, must show, not only that illegal votes were cast, but also that they were canvassed for his competitor. If they were cast

for the party making the demand, they are not to be subtracted
from the vote of his opponent, upon mere proof of their illegal-
ity.   That would be double robbery, and yet that is a possible,
not to say, probable, result of the rule to permit a party to
make mere proof of the illegality of votes cast, and stop there,
without showing for whom they were cast, or canvassed, and
demand the apportionment of the fraud among the candi-
dates.''

In *Jaycox* v. *Varnum*, 39 Idaho, 78, 226 Pac. 285, the su-
preme court of Idaho held that the rule of apportionment is
purely arbitrary, decides nothing, and is justly subject to the
criticism given it by Mr. Paine in his work on Elections.   This
accords with our views.

It was incumbent on the plaintiff to show by a preponderance
[7] of the evidence the number of illegal votes received by
Wolf Point in each precinct in which illegal voting was
charged, and that number must be sufficient, if rejected, to
change the result.   Where the ballots cast by illegal voters are
capable of identification or where satisfactory proof is given
as to how the votes were cast, proper deductions should be
made by the court so as to determine the correct result.   But
where votes are shown to have been cast illegally in a given
precinct, neither the entire election nor that of a precinct
should be annulled, if it may be by the court avoided under
the facts.   Each case, however, must be determined upon its
own peculiar facts.

The election must be sustained unless votes cast for a can-
didate are found to be illegal in number sufficient to change
the final result.   The court has made its findings based on
evidence before it, and has thereby excluded as illegal certain
votes cast in several of the election precincts in favor of Pop-
lar, as well as votes in favor of Wolf Point.   By the court's
findings after holding certain votes illegal as to each of the
contestants, the majority in favor of Wolf Point was increased
five votes.   As to illegal votes cast, the court found, based
upon sufficient evidence before it, that the plaintiff failed to

prove by competent evidence that a sufficient number of illegal votes were cast in favor of Wolf Point at the election, which, after deducting illegal votes cast for Poplar, would change the result of the election, and that therefore the plaintiff failed to prove his case.

In precincts numbered 2, 3, 4, 25 and 31 the plaintiff urged as ground for the disqualification of voters that certain persons named had not been residents of the precinct in which they voted for thirty days immediately preceding the election, or for other causes were not entitled to vote. There were thirty-five such voters in these precincts. The court found five had removed from the county prior to the election and were not entitled to vote, that four were not citizens and therefore their votes illegal, and that a vote cast in precinct 4 was illegal because the elector took a sample ballot into the election booth with her. Of these ten votes it was found that the last mentioned constituted a ballot in favor of Wolf Point, and that as to the other nine there was no proof as to whether they were cast in favor of Wolf Point or Poplar. In precinct 25 Joseph C. Boyer was duly registered as a voter but by mistake of the county clerk his name appears in the check register as Joseph S. Boyer. He was a resident of the precinct, and the court held his vote legal. Fourteen were held entitled to vote because registered in the particular precinct in which they voted, although they had removed their residence to another precinct before the election, and generally the court made the following pertinent finding: ''The court finds as a court of equity that his [the plaintiff's] hands are not any cleaner than the hands of the partisans of Wolf Point, and that in a court of equity he is not entitled to benefit by the alleged misconduct on the part of the partisans of Wolf Point, the evidence conclusively showing that he and other partisans of Poplar committed or caused to be committed like acts.''

As to those voters who had removed from the precincts in which they voted prior to the election, it was stipulated by counsel during the trial that they were duly registered in the

precinct wherein they voted, and did not cast a vote in any other precinct; that they were citizens of the United States and had been residents of the state for more than one year and of the county more than thirty days prior to the election, although they had removed from the precinct in which they voted prior to the election. The court found as to them that they were legally qualified to vote. Whether the court was correct in its decision on this question is not necessary to be decided, for these votes may be all eliminated as illegal and deducted from Wolf Point's majority and the result of the election remain unchanged.

In precinct No. 23 there were four impersonations of registered voters and votes cast therein by persons not entitled to vote, and in precinct No. 24 one Joe McIntee was given a ballot by the judges of election and signed the check register on a line upon which appeared a record of the registration of his father, John McIntee, who died August 22, 1922. It appears, however, that Joe McIntee acted in good faith, under a belief that he had been duly registered and was entitled to vote, and that the judges acted in good faith and did not discover the mistake in the identity of the voter at the time he called for a ballot, signed the check register, and voted. The court found all five of these votes to have been cast in favor of Wolf Point and that they were illegal. Accordingly they were excluded from the court's computation of the correct total vote cast for Wolf Point. As to these five illegal votes the court found specifically as to the four cast in precinct No. 23 that the judges of election were not guilty of fraud, and that there was nothing to indicate that any of the persons impersonating registered electors in voting were other than the registered elector, and that the election was honestly and fairly held. With respect to precinct No. 4, it was found by the court that permitting Joe McIntee to vote in the name of John McIntee was an inadvertence on the part of the judges of election and a mistake on the part of Joe McIntee; that there was no fraud connected with the casting of his vote on the part of the

judges, or clerks or the voter, nor was there intention on the part of the judges, the clerks or the voter, that an illegal vote should be thus cast. There is ample evidence to support these findings, and they must be sustained, in view of the further finding made by the court, based on evidence, as to each and all of these precincts, in substance: That no mistakes or irregularities on the part of any judge or clerk of election complained of by the plaintiff were committed pursuant to any fraudulent act or purpose on the part of any elector or with any design or intent on the part of the judges or clerks of election or any elector to violate any law relating to elections, and did not in any respect affect the result of the election.

This disposes of group assignments of error 1, 5 and 6.

Group assignments of error 3, 4 and 10 involve questions **[8]** respecting irregularities in holding the election in precincts numbered 4 and 31. In our opinion, there is no merit in these assignments. Electors will not be disfranchised simply because of the failure of officers charged with the conduct of elections to perform the duties imposed upon them by law. We stated the correct rule applicable in the case of *Thompson* .v. *Chapin,* 64 Mont. 376, 209 Pac. 1060, which we now reaffirm, as follows: "The general rule laid down by this court, which appears to be universally recognized, is that the right of our citizens to vote at an election cannot be defeated because of the failure of election officials to perform an administrative duty in the conduct of the election, specifically imposed upon such officials. (*State ex rel. Brooks* v. *Fransham,* 19 Mont. 273, 48 Pac. 1; *Lane* v. *Bailey,* 29 Mont. 548, 75 Pac. 191; *Carwile* v. *Jones,* 38 Mont. 590, 101 Pac. 153; *Stephens* v. *Nacey,* 47 Mont. 479, 133 Pac. 361; *Harrington* v. *Crichton,* 53 Mont. 388, 164 Pac. 537.)   *   *   *

"Ignorance, inadvertence, or even intentional wrong on the part of the judges of election should not be permitted, in the absence of fraud or collusion, to disfranchise an elector, much less an entire precinct. While it is true that irregularities invite a concealed fraud, yet, where the fault lies with the elec-

tion officials rather than the elector, they should be disregarded, unless the statute expressly declares that the same is fatal to the election, or unless they are such as in themselves change or render doubtful the result of the election. The voter should not be deprived of his right to vote nor the successful candidate suffer, if by any reasonable interpretation of the statutes governing elections it can be prevented."

As to precinct No. 31, there was a total of 152 votes cast, [9] five being in favor of Poplar and 147 for Wolf Point. Were the total vote in this precinct to be excluded, the final result of the election would remain the same; however, because of the votes challenged in other precincts, we have concluded to give this assignment more than passing notice. Were the election in this precinct found to be illegal, and enough votes in other precincts also found to be illegal, the aggregate might be sufficient to change the result of the election. Counsel's contention is that the election held in this precinct is void, because an Indian trading post was the polling place.

The statute is directory as respects the duty of the board of county commissioners in establishing election precincts and does not invalidate an election or disfranchise lawful voters after the fact, simply because of the failure of the board to heed its directions. The statute reads: "No *officer* of this state * * * shall establish a voting precinct within or at the premises of any Indian agency or trading post." (Sec. 552, Rev. Codes 1921.)

It will be noted that the statute in question relates to the *establishment of election precincts*, whereas, plaintiff's objection to the election held at Cogswell's store is because of the *polling place* designated by the board of county commissioners. There is a very clear distinction drawn in the statutes between an *election precinct* and a *polling place* (secs. 545, 546, 548, 550 and 551, Rev. Codes 1921), but we are not called upon in this case to differentiate them. The court found, based upon evidence, that this precinct had been created by the

board of county commissioners and Cogswell's store designated
as the polling place; that, although the land embraced in the
precinct was formerly a part of the Fort Peck Indian Reser-
vation, that reservation was by the government thrown open
for settlement long prior to the date of the creation of Roose-
velt county, and that prior to the year 1908, Indian title to
the land upon which Cogswell's store was situated had been
extinguished; that after the opening of the reservation to set-
tlement the land within this precinct was either allotted to the
Indians, or made subject to entry by any person who might
apply therefor, and that much of the land was patented prior
to November 7, 1922, and was subject to taxation in Roosevelt
county; that all electors entitled to vote in the precinct, who
desired to vote, were afforded no other place than Cogswell's
store at which to cast their ballots, and that no person in the
precinct was deprived of his vote by reason of the polling
place being established at Cogswell's store, and every qualified
elector was notified by the county clerk prior to the election
that he must cast his ballot in precinct 31 at Cogswell's store;
that until this action was commenced no one had ever ques-
tioned the validity of the establishment of the precinct or the
designation of Cogswell's store as a polling place, and that
all electors in the precinct were lulled into the belief that
their votes were legally cast by the failure of any person to
question the right of anyone to vote in that precinct at the
polling place designated; that the election was honestly and
fairly held in that precinct, and the votes cast thereat cor-
rectly canvassed, counted and returned; and that such returns
are free from fraud, material irregularities or errors, and are
unimpeached.

Group assignment of error No. 2 is based upon the alleged
[10] violation of the Corrupt Practices Act at Bainville, in
precincts 2, 3 and 4. The total vote cast in these three pre-
cincts was 375, divided as follows:

| 2. | | 3. | | 4. | |
|---|---|---|---|---|---|
| Poplar | 16 | Poplar | 9 | Poplar | 26 |
| Wolf Point | 85 | Wolf Point | 66 | Wolf Point | 173 |

In his complaint the plaintiff alleged that by reason of corrupt practices sixty-one persons who voted in precinct 2, forty-three in precinct 3 and eighty-one in precinct 4 were unlawfully induced to vote for Wolf Point. During the course of the trial and after the plaintiff had rested, the court, either upon the stipulation of counsel or motions made by the defendants, struck from the plaintiff's complaint the names of all persons alleged to have been influenced to vote by corrupt practices except thirty in precinct 2, thirteen in precinct 3 and seventeen in precinct 4. Of such action by the court no complaint is made by the plaintiff. The ground of attack against the votes cast in these precincts is that a free lunch was served and a free dance given at Bainville four days before the election, the expenses incident to which were paid by partisans of Wolf Point, and that automobiles were used to convey electors living in these precincts to the polls, the expense incident to which was paid by the partisans of Wolf Point. It appears that on the night of November 3, 1922, a meeting was held in the Bluebird Theater at Bainville, at which speeches were made in favor of Wolf Point; a lunch consisting of sandwiches, cake and coffee was served free of charge, and dancing was participated in by some residents of these precincts who attended the meeting. The lunch was served by Mrs. Mary Provost, president of the Catholic Altar Society, with a view of securing money with which to pay debts of the Catholic church, and it was paid for by W. L. Young, one of the defendants in this action, a partisan of Wolf Point.

For two or three days preceding the election and a part of election day a severe snow and rain storm had raged in the vicinity of Bainville, making it difficult to travel. A number of residents of Bainville furnished their automobiles in order to aid electors to get to the polls, and it was agreed that the people of Bainville would donate sufficient funds to pay for the gasoline and oil used by such automobiles; the owners being required to drive their own cars or furnish drivers therefor.

There were at least twenty automobiles and drivers so furnished, and the expense incident thereto was paid by William Powers, a long-time resident of Bainville and a partisan of Wolf Point. In hauling electors to the polls no discrimination was made as to persons known to favor one town or the other in the county seat election.

Whether or not the Corrupt Practices Act (secs. 10773 to 10820, inclusive, Rev. Codes 1921) applies to county seat elections is not necessary to decide, as this is a suit in equity, and the district court has found on ample evidence that the plaintiff has failed to prove corruption or fraud in the election held in the several precincts involved, that the sandwiches, cake and coffee were not served with the hope or intent to influence any person or persons to vote for Wolf Point and that none of the persons partaking thereof were in any manner thereby influenced to vote for Wolf Point, and further that those participating in such lunch did not accept or receive the same with the understanding or belief that it was furnished with the intent or hope of influencing them to vote for Wolf Point. Further, it was found by the court, from evidence before it, that the oil, gasoline, automobile equipment and repairs furnished free to the owners of automobiles and their drivers in connection with the use of automobiles to haul electors to the polls were not furnished with the intent to influence the persons carried to the polls to vote for Wolf Point, and that such electors were not thereby so influenced, and that the general purpose in furnishing such transportation to electors was to enable voters generally to reach the polls in order to express their choice for the permanent county seat of Roosevelt county; and the general concluding finding of the court as to each of these precincts is substantially as follows: That the election held in the precinct was fairly and honestly conducted; that the judges of election performed their duties honestly and in good faith; that the votes cast were correctly canvassed, counted and returned, and express the will of the respective electors upon the question of the selection of a per-

manent county seat; that no mistakes or irregularities on the part of any judge or clerk of election complained of by the plaintiff were committed pursuant to any fraudulent act or purpose on the part of any elector, or with any design or intent on the part of the judges or clerks of election or of any elector to violate any law relating to elections, and did not in any respect affect the result of the election; and that the returns of the precinct are free from fraud, material irregularities or errors, are unimpeached and correctly show the result of the election held in the precinct as found by the court as to the number of votes cast in favor of Wolf Point, and those in support of Poplar. Since there was ample evidence to sustain the court's findings, they must be upheld on this appeal.

Groups of error 7 and 8, assigned by the plaintiff, relate to the admission and rejection of evidence by the trial court. We have carefully considered these and find them to be without merit. Plaintiff's rights were not prejudiced by the court's rulings on the admissibility of testimony; at any rate, he has failed to point out wherein he suffered prejudice. It is [11] commanded by statute that the court shall disregard any error which does not affect the substantial rights of the parties. (Sec. 9191, Rev. Codes 1921.) The statute is imperative in its mandates and must be heeded. (*Kipp* v. *Burton,* 29 Mont. 96, 101 Am. St. Rep. 544, 63 L. R. A. 325, 74 Pac. 85.) The contention that the court erred in reserving its rulings on the admission of evidence at the time testimony was introduced is of no avail to the plaintiff in avoidance of the court's order setting aside the injunction. This is an [12] equity case, and whether incompetent evidence was admitted by the court in given instances or rulings were by the court reserved on the admissibility of testimony, the presumption is that the court in making its order considered only the competent evidence before it. (*King* v. *Pony Gold Min. Co.,* 28 Mont. 74, 72 Pac. 309; *State ex rel. Rankin* v. *Martin,* 68 Mont. 392, 219 Pac. 632.)

Finally, it is plaintiff's contention that the court's findings are contrary to the evidence. The evidence was sufficient to justify the court in making its order dissolving the injunction *pendente lite;* and, having satisfied ourselves of this fact, we need go no further in consideration of the several specific findings made by the court.

This case having been twice before us on appeal, we now feel that we are thoroughly conversant with the facts and the law applicable. The expressed will of a majority of the electors of Roosevelt county in the selection of a permanent county seat has been so long delayed because of this litigation, it is ordered that a *remittitur* issue forthwith.

The judgment and order are affirmed.

*Affirmed.*

MR. CHIEF JUSTICE CALLAWAY, ASSOCIATE JUSTICES HOLLOWAY and STARK and HONORABLE A. J. HORSKY, District Judge, sitting in place of Mr. JUSTICE COOPER, disqualified, concur.