DUBIE, Appellant, *v.* BATANI, Respondent.

(No. 7,196.)

(Submitted June 28, 1934. Decided July 24, 1934.)

[37 Pac. (2d) 662.]

470

*Mr. Howard A. Johnson* and *Mr. Earle N. Genzberger,* for Appellant, submitted an original and a reply brief.

*Mr. William Meyer* and *Mr. N. A. Rotering,* for Respondent, submitted a brief and argued the cause orally.

MR. JUSTICE ANDERSON delivered the opinion of the court.

This is an election contest. At the general election held on November 8, 1932, contestant was the regular nominee of the Republican Party for an unexpired term of approximately four years for the office of county commissioner of District No. 1 in Silver Bow county. The contestee, Fred Batani, was the regular nominee of the Democratic Party for this office The board of county canvassers certified that the contestant

received 9,886 votes, and the contestee received 9,906, thereby declaring the contestee elected by a majority of twenty votes. Contestant filed his petition, alleging deliberate, serious and material violations of the election laws of Montana, erroneous or fraudulent count of the votes for the office at the election, and an erroneous canvass of the votes. Other grounds were alleged, which are unimportant here by reason of the failure of the contestant to produce evidence tending to sustain them.

The contestee answered and trial was had before the court sitting without a jury, resulting in a judgment of dismissal of the petition of contestant. A motion for a new trial was made, heard and denied. The appeal is from the judgment.

Allegations were made in the petition charging misconduct in the conduct of the election and the count of the vote in a number of precincts. It is conceded, however, that the only precincts involved on this appeal are Nos. 9 and 11. The allegations made with reference to the other precincts admittedly were not sustained by the proof.

The totals extended in the tally sheets in precinct No. 11 disclosed 249 votes for Batani and 122 for Dubie, although the actual total of the tallies thereon was ten less for each candidate. A like error was made with reference to the extension of the totals for numerous other candidates. These tally sheets bear the admitted signatures of four of the judges and one of the clerks. The fifth judge testified that she preferred to say that they did not contain her signature, although proof by a handwriting expert established clearly that the documents did contain it. The total as certified by the judges and clerks in the poll book for this precinct showed that Batani received 249 votes and Dubie 152. The testimony as to the signatures of the clerks and judges on the certificate attached to the poll books is identical to that concerning the tally sheets.

The clerks and judges certified to a checker's card for the Republican Party the same totals as were disclosed by the poll book. The judges of election and clerks in precinct 11, and other persons present, testified that the vote was fairly

and correctly counted. The count of the vote was had in the presence of numerous spectators as well as checkers for the various political parties. No one assumed to testify that the count was incorrectly made by the judges and clerks of election in the precinct. The voted ballots from this precinct were rolled and deposited in a sack, which was sewed and sealed. The sack containing the ballots, the poll books and the tally sheets were all inclosed in the ballot-box after the aperture used for depositing ballots had been covered and sealed. The ballot-box was locked and delivered to the county clerk of Silver Bow county.

The "pink sheet," also referred to in the evidence as "a summarization sheet," is in the same form and size as the official ballot. The copy of it, delivered to the county clerk, showed the same totals for these candidates as did the poll books from precinct No. 11.

On the morning of November 9, 1932, the day following the election, the county clerk assembled four of the judges of election from precinct No. 11 in his office, and in their presence, and in the presence of two of his deputies, the ballot-box from this precinct was unlocked, opened and the tally sheets were removed therefrom. The totals on the summarization sheet for the candidates in question were struck out and made to conform to the totals appearing on the tally sheets, and a new pink sheet was prepared for precinct No. 11 at that time, showing the totals for all candidates as they appeared on the tally sheets. Everything which had been removed from the ballot-box was thereupon, in the presence of those assembled, again returned to it, and the ballot-box locked. Some evidence was produced on the trial with reference to one of the judges miscalling during the count of the ballots a vote for his brother-in-law, who was a candidate for the legislature. Also there was some evidence as to one of the judges partaking of several drinks of intoxicating liquor during the course of election day and the evening following. The evidence, however, does not disclose that he thereby became intoxicated.

The ballots and election returns from both precincts were delivered by one of the judges in the ballot-boxes, the openings in which used for the deposit of ballots had been sealed. They were transported by deputy county clerks to the office of the county clerk, where they were deposited in a room or vault. The locks on the ballot-boxes were of a cheap variety, which an expert testified could be opened with almost any kind of instrument capable of being inserted in the aperture designed for the entry of the key into the lock. One of the locks, he testified, was bulged, which might indicate a tampering with it. The room in which the ballot-boxes were kept had some three entrances. On all the doors of the various entrances were two locks, each requiring a different key to operate. The keys to the ballot-boxes were kept, prior to the commencement of the contest, on a board in the same room or vault where the boxes were in storage. After the contest the keys were removed to another vault in the same office.

It appeared that many persons, including various county officers, janitors, watchmen and other county employees, had master keys which would open the doors to the office of the county clerk, and one of these locks on the doors of the vault or room where the ballot-boxes were stored. So far as disclosed, but two keys for the second lock on the doors of the vault or room were in existence and in possession of the county clerk and his chief deputy, respectively. These locks had been changed and new keys manufactured soon after the commencement of the contest, and a like change of the same locks and keys had been made some six years prior to that date. As to whether other keys were made by the locksmith at either time the locks were changed other than the two keys which were in the possession of the county clerk and his chief deputy, the record is silent. After the commencement of the contest, pursuant to order of the court, guards were maintained at night outside the office of the county clerk, and during office hours near the doorway leading to the vault, which was unlocked and open. The county clerk and his

deputies testified that no one was permitted to tamper with the ballot-boxes during office hours, and that both locks on all the doors were locked at night by closing the doors. The second lock, however, by the operation of a catch could be adjusted so that the second lock, upon the closing of the door, would not operate, and as to whether this was ever done, the testimony is of a negative character. Many persons in whose possession master keys were testified to be did not testify at the trial.

Over objection of the contestee the voted ballots from precinct No. 11 were offered and received in evidence and counted by the court. The count thus made reduced Batani's total seven votes and increased Dubie's fifty-two votes, making a net change of fifty-nine votes.

It was testified by various witnesses that on the counting of the ballots by the judges and clerks of election in precinct No. 9, from one to four votes were counted erroneously for Batani; it was, however, conceded by all that at least one of these four errors was corrected immediately after it occurred. Numerous witnesses testified that all errors of this character were corrected; others testified that two or three were not corrected. The judges and clerks in this precinct all testified that the ballots were correctly counted and that any mistakes of this kind were promptly rectified. The ballots were offered in evidence and admitted without objection. The recount made by the court resulted in Dubie's receiving 197, and Batani's 144, an increase of forty-seven, and a decrease for Batani of forty-two, making a net gain of eighty-nine ballots for the contestant.

The court found with reference to the vote in both precincts that the judges and clerks of election were not guilty of malconduct in office, nor was there any deliberate or serious or material violation of the provisions of the election laws, nor any erroneous or fraudulent count. It was further found, with reference to the county clerk's opening the ballot-box on November 29 from precinct No. 11, that the proceedings were without authority in law, but done without any intention

to violate the laws, and that the tally sheets were not molested, altered or changed, and that these acts did not affect or change the result of the election, and that the tally sheets, when presented to the board of canvassers, truly represented the result of the count in the precinct. The court further found that certain of the ballots, which it marked for identification, from both precincts had been tampered with, and that cross-marks in front of the name of Dubie had been placed thereon by persons other than the voter. Conclusions of law were made rejecting the voted ballots from both precincts, and that the returns as shown by the tally sheets were the best evidence of the vote cast for the candidates, and were accepted by the court as evidence of the vote.

Objection was made to the settlement of the proposed bill of exceptions tendered on behalf of the contestant. The objections were overruled and the bill of exceptions was settled. The contestee assigns error and moves to strike the bill of exceptions from the record. The proposed bill was served within the time extended by various orders of the trial court. The objection and motion are based upon the ground that the showing made for the extension beyond the seventy-five day period was insufficient. It appears from the affidavits that no transcript of the testimony was ordered from the official stenographer until the lapse of forty-four days after the denial of the motion for new trial. The excuse offered in the affidavit of contestant for his failure to order the transcript at an earlier date was that it was necessary for him to deposit in advance the compensation for the transcribing; that he was without employment and was unable to obtain the necessary funds until the time when it was ordered.

By the terms of the statute (sec. 9390, Rev. Codes 1921), the district judge is authorized, upon affidavit showing the necessity for further time, to extend the time beyond the seventy-five day period. (*Langston* v. *Currie*, 95 Mont. 57, 26 Pac. (2d) 160.) This statute does not state what does or does not amount to a necessity of further time. The trial court by the granting of the extension found the showing sufficient,

and we are not disposed to hold that court in error as for an abuse of that sound judicial discretion reposed in it by the terms of the statute. Under the showing made, if the application were denied, the contestant would be deprived of his right to secure a review by this court of the action of the lower court, solely because of the lack of funds. Discretion should be reasonably exercised in favor of permitting poor persons to litigate what they believe to be a just cause of action. The motion to strike is denied.

Contestant assigns error on the failure of the court to accept the poll books as the primary evidence of the count by the election judges and clerks. This question is raised throughout the record by objections and specifications of error challenging the correctness of the court's rulings in the reception of evidence and in making findings.

Section 778, Revised Codes 1921, provides in part: "As the ballots are read, each clerk must write at full length on a sheet to be known as a tally-sheet the name of every person voted for and of the office for which he received votes, and keep by tallies on such sheet the number of votes for each person. The tally-sheets must then be compared and their correctness ascertained, and the clerks must, under the · supervision of the judges, immediately thereafter set down, at length and in their proper places in the poll books, the names of all persons voted for" and the votes received, "as shown by the tally-sheets." The judges of election are required to inclose in a sealed package or envelope one of the tally sheets and poll books, together with other documents, as the returns of the election to the county clerk.

It will thus be seen that the original record made of the count of the vote in the election precinct is the tally sheet, and the totals copied into the poll book are obtained from that source. Primary evidence is the kind of evidence which, under every possible circumstance, affords the greatest certainty of the fact in question. (Sec. 10494, Rev. Codes 1921.) Since the totals are copied from the tally sheet, it affords the greatest certainty as to the result of the count, and hence

the sheet is the primary evidence of the count. The court correctly ruled that the tally sheet was the primary evidence.

Contestant contends that the court was in error in finding that the ballots from precinct No. 11 had been tampered with and in rejecting the result of the count of the ballots as received in evidence. It is conceded that before the ballots from precinct No. 11 were properly admissible in evidence, the returns must be impeached, and it is argued that they were in fact impeached and the court so ruled when the ballots were received in evidence, and that, after so received, they are the best evidence of the votes cast in the precinct.

The returns of the votes of a precinct made in due form and signed by the proper officers are the best evidence as to the state of the vote; yet they may be impeached on the ground of fraud by whomsoever perpetrated, or misconduct on the part of the officers of the election themselves (sec. 569, 4th ed., McCreary on Elections), and the returns, until impeached, furnish prima facie evidence of the correctness of the results so returned. (*Sommers* v. *Gould,* 53 Mont. 538, 165 Pac. 599.) If the impeachment of the returns be not required as a foundation of the admission of the ballots over objection, then in any election contest, upon general allegations of fraud and misconduct, a contestant, without any preliminary proof, would be permitted to offer the ballots and secure a recount by the court. If such is the law, there would be little occasion for the existence of a board of canvassers. Their function would be an idle form. Much time and expense would be saved by ordering the returns and ballots to be delivered to the court for a recount. The legislature has not provided for this procedure. Before the ballots may be received in evidence over objection, the returns must be impeached to the extent that there is sufficient evidence to overcome the prima facie case made upon the production of the returns.

Contestant argues in support of his contention that the returns were impeached by the discrepancy between the "pink sheets"—the "summarization sheet"—and the tally sheets. The summarization sheet is provided for by sections

608–611, Revised Codes 1921. It is there said that each precinct shall be supplied with six printed forms for the use of the judges in transmitting election returns for public information. They are to be in the form of the ballot on tinted paper containing the names of all candidates and propositions voted for. Upon the completion of the count of the ballots it is the duty of the election judges correctly to copy the total vote cast for all candidates upon this sheet. One of them, when complete, is to be posted at the polling place, and one copy transmitted by mail or messenger to the county clerk; this document is not inclosed or sealed with other returns. There is nothing contained in our statutory law requiring this sheet to be delivered to, or considered by, the board of canvassers. Its purpose is declared in the law itself to be for public information. These sections were enacted as Chapter 12 of the Laws of 1915. The title of the Act is: "An Act to facilitate the publication of election returns." The title of an Act is indicative of the legislative intent in passing it. (Nangle v. Northern Pacific Ry. Co., 96 Mont. 512, 32 Pac. (2d) 11.) It is manifest from the title of the Act, and from the Act itself, that the sole purpose of its enactment was to give the public information as to the result of the vote in precincts prior to the opening of the sealed returns by the board of canvassers. These documents are no part of the election returns which are required by section 782 to be transmitted in sealed packages to the county clerk.

The miscounting of a vote for one who was not a candidate for the office here in question, while possibly admissible in evidence, standing alone is of insignificant importance.

The proceedings in the office of the county clerk on the ▮ morning of November 9 were contrary to law, but the evidence fails to disclose that anything was changed or tampered with, other than the summarization sheet, which was no part of the returns. The mistake in the transfer of the totals from the tally sheets to the poll book and the pink sheet, was insufficient to impeach the returns. The tally sheets themselves furnish the means of correction and the elimination of

such errors is the very purpose of the canvass. The canvassing board has no other reason for existence. (*Quigley* v. *Phelps,* 74 Wash. 73, 132 Pac. 738, Ann. Cas. 1915A, 679.)

Another irregularity urged is the failure of the judges of election to string the voted ballots in compliance with the provisions of section 779. The irregularities of which complaint is here made did not obstruct or prevent the ascertainment of the result.

The evidence was insufficient as a foundation to permit the reception of the voted ballots from precinct No. 11 in evidence, over objection, as the returns were not sufficiently impeached. The trial court by its findings as to the freedom from fraudulent conduct and mistake of the election officials in effect so held, although theretofore it had admitted the ballots in evidence. The court, however, by its conclusions of law, rejected the ballots from this precinct upon the ground that they had been tampered with so as to destroy their evidentiary value.

The rule is that if the conclusion of the trial court is correct, it is immaterial what reasons were assigned for it. (*In re Metcalf's Estate,* 93 Mont. 542, 19 Pac. (2d) 905; *Grush* v. *Grush,* 90 Mont. 381, 3 Pac. (2d) 402; *Whitcomb* v. *Beyerlein,* 84 Mont. 470, 276 Pac. 430; *Hale* v. *Belgrade Co., Ltd.,* 75 Mont. 99, 242 Pac. 425; *Lee* v. *Laughery,* 55 Mont. 238, 175 Pac. 873; *Minneapolis Steel & Machinery Co.* v. *Thomas,* 54 Mont. 132, 168 Pac. 40; *State* v. *Rocky Mountain Elevator Co.,* 52 Mont. 487, 158 Pac. 818; *Cooper* v. *Romney,* 49 Mont. 119, 141 Pac. 289, Ann. Cas. 1916A, 596; *City of Butte* v. *Goodwin,* 47 Mont. 155, 134 Pac. 670, Ann. Cas. 1914C, 1012.)

The ballots received in evidence without objection from precinct No. 9 were disregarded by the trial court on the ground that certain of the marks made in front of Dubie's name were not made by the voter, and accordingly a conclusion was made rejecting the ballots. The ballots have been certified to us and have been examined. The poll book showed 382 ballots voted in this precinct. On thirty-four of them

crosses were placed before both the names of Batani and Dubie. From a casual observation of these thirty-four ballots it is obvious that on many of them the same lead pencil in the hands of the same individual made the crosses in front of Dubie's name. The other marks on these balots in many instances were written by a heavy hand with a soft pencil, making more or less blurred marks, whereas on these particular ballots the cross in front of Dubie's name was made with a hard pencil, making clear and distinct marks. This fact that thirty-four ballots were so marked in itself is a strong circumstance to support the finding of the trial court that the ballots from this precinct had been tampered with when consideration is given to the number of double votes given to other candidates. The total double votes for other candidates in this precinct, as disclosed by the total ballots, are as follows: For Congress, 1; Governor, 3; Lieutenant-Governor, 3; Attorney General, 1; Secretary of State, 1; State Treasurer, 1; State Auditor, none; Superintendent of Public Instruction, 2; Railroad and Public Service Commissioner, 2; Sheriff, 1; Clerk and Recorder, none; County Attorney, 1; County Treasurer, none; Clerk of the District Court, 1; Assessor, 2; County Commissioner, District No. 2, 3; Coroner, 1; Surveyor, 1; Public Administrator, 1.

Another circumstance strongly tending to support the finding of the trial court that the ballots had been tampered with is the following: It appears that only four persons out of 382 voting failed to express a choice for the office of county commissioner of District No. 1, whereas the number of blank ballots for other offices in this precinct where the persons failed to vote for the particular office indicated is as follows: Congress, 33; Governor, 23; Lieutenant-Governor, 49; Attorney General, 37; Secretary of State, 49; State Treasurer, 34; State Auditor, 48; Superintendent of Public Instruction, 57; Railroad and Public Service Commissioner, 49; Sheriff, 10; Clerk and Recorder, 39; County Attorney, 17; County Treasurer, 38; Clerk of the District Court, 43; County

Assessor, 34; County Commissioner, District No. 2, 19; Coroner, 64; County Surveyor, 53; Public Administrator, 54.

The names of the candidates for commissioner in District No. 2 appeared on the ballot immediately below those of the parties to this action. All commissioners are elected by the county at large, and the duties of all are identical. The commissioner to be elected from commission District No. 2 was for the full term of six years. Neither of the candidates for commissioner in District No. 1 had ever lived in this precinct. No close relative of either resided there.

As to all the enumerated offices in these tabulations, candidates had been regularly nominated for each and all of them, and their names appeared upon the printed ballot as candidates of the two political parties in like manner as the names of the parties to this action appeared.

From all the facts and circumstances, the conclusion is inescapable that the voted ballots in precinct No. 9 had been tampered with by some person or persons between the time of their delivery to the county clerk and their production in the trial court.

The rule for which the contestant contends, i. e., that the ballots are the best evidence, is without application where it appears that, when the ballots are produced, they have been tampered with between the time of the election and their production in court. (McCreary on Elections, 4th ed., sec. 572; *Rhode* v. *Steinmetz*, 25 Colo. 308, 55 Pac. 814.) The evidence attempting to impeach the returns from this precinct fell short of overcoming the prima facie case by the production of the returns. The trial court did not commit error in rejecting the ballots from precinct No. 9.

The returns from these precincts should not be entirely disregarded on the proof in the record. This court, in the case of *Atkinson* v. *Roosevelt County*, 71 Mont. 165, 227 Pac. 811, said: "The general rule laid down by this court, which appears to be universally recognized, is that the right of our citizens to vote at an election cannot be defeated because of the failure of election officials to perform an ad-

ministrative duty in the conduct of the election, specifically imposed upon such officials. (*State ex rel. Brooks* v. *Fransham,* 19 Mont. 273, 48 Pac. 1; *Lane* v. *Bailey,* 29 Mont. 548, 75 Pac. 191; *Carwile* v. *Jones,* 38 Mont. 590, 101 Pac. 153; *Stephens* v. *Nacey,* 47 Mont. 479, 133 Pac. 361; *Harrington* v. *Crichton,* 53 Mont. 388, 164 Pac. 537.) * * * Ignorance, inadvertence, or even intentional wrong on the part of the judges of election should not be permitted, in the absence of fraud or collusion, to disfranchise an elector, much less an entire precinct. While it is true that irregularities invite a concealed fraud, yet, where the fault lies with the election officials rather than the elector, they should be disregarded, unless the statute expressly declares that the same is fatal to the election, or unless they are such as in themselves change or render doubtful the result of the election. The voter should not be deprived of his right to vote nor the successful candidate to suffer, if by any reasonable interpretation of the statute governing elections it can be prevented.''

On the trial of the cause the court sustained an objection ▮▮▮▮ to a question as to how one of the judges in precinct No. 11 voted at the election. This ruling is specified as error. A witness may refuse to testify as to how he voted, but this is a privilege he may waive. (*Lane* v. *Bailey,* supra.) Like inquiry was made of no other witness. No witnesses testified as to for whom they voted. The offer of proof was to the effect that the witness voted for Batani. Whatever her testimony might have established in this respect, the result would not be changed. "An appellate court will not reverse a judgment merely because the lower court committed error; it is only when the error has materially affected appellant's rights on the merits of the case." (*Lane* v. *Bailey,* supra.) If the testimony was offered for the purpose of showing that the witness was free from bias in favor of Dubie, the record discloses that she had already testified that she was a member of the Democratic Party, did not know Dubie, and had actively supported the cause of Batani prior to election. The refusal of the offer of proof, viewed upon that theory, was

harmless, as her testimony clearly established that she was not a Dubie supporter.

Complaint is made of the court's refusal to permit, over objection, testimony as to a mistake in the returns made by a majority of the same judges, in the same precinct at the primary nominating election held in July, 1932. One or more of these judges had previously testified that it was impossible for any mistake having been made in the count in the election of November, 1932. The offer of proof was made for the purpose of rebutting the testimony of the judges. It clearly shows it related to a collateral matter to the issues in this case, and was an attempt to impeach a witness. The offered testimony was incompetent for any purpose and the ruling of the court was correct. (*State ex rel. Bourquin* v. *Morris,* 67 Mont. 40, 214 Pac. 332.)

On the trial of the case, after the contestant had offered testimony in an attempt to impeach the returns from precinct No. 11, and upon the offer of the ballots in evidence, the contestee requested leave to produce evidence tending to rebut that of the contestant; the request was granted. Thereupon certain of the election judges testified as to the manner in which the count was conducted in the precinct. After the ballots were received in evidence and the contestant had rested, like testimony was again offered and received over the objection of the contestant. The ground of the objection was that the contestee had theretofore been afforded the opportunity to submit testimony on the question, and by failure to offer it at that time the right to produce further testimony was waived, and upon the further ground that it was an attempt to impeach the ballots which were said to be the best evidence.

Ordinarily, the testimony of the election officials as to the manner in which the election was conducted and the count of the ballots made, is admissible in order to enlighten the court upon the question as to whether or not the ballots were properly counted and the election conducted in a lawful manner. (*Viel* v. *Summers,* 35 Idaho, 182, 209 Pac. 454; *Rhode* v.

██ *Steinmetz,* supra.) The objection that the contestee had waived his right by failing to offer this proof before the ballots were received in evidence goes largely to the question of the order of proof, with respect to which the trial court must be permitted to exercise a reasonable discretion (*Hawley* v. *Richardson,* 60 Mont. 118, 198 Pac. 450; *Stephens* v. *Elliott,* 36 Mont. 92, 92 Pac. 45; *Morrison* v. *Concordia Fire Ins. Co.,* 72 Mont. 97, 231 Pac. 905), subject to review only in case of abuse of discretion. (*Noyes* v. *Clifford,* 37 Mont. 138, 94 Pac. 842.) The above testimony having been admissible, the court did not abuse its discretion in permitting the witnesses to testify somewhat out of the regular order. This is especially true in the trial of an equity case before the court without a jury.

In view of the conclusion reached, it is unnecessary to notice the cross-assignments of error made on behalf of the contestee, and likewise it is unnecessary to consider other specifications of error made by the contestant.

Judgment affirmed.

Associate Justices Matthews and Stewart concur.

Mr. Chief Justice Callaway: I agree that the motion to strike should be denied.

If there is any controversy between the poll books and tally sheets as to the number of votes cast for a candidate, the tally sheets, the basis of the poll books, if not tampered with, are the primary and therefore the best evidence on that score.

From the whole record I believe fraud was perpetrated, but I am unable to place the blame.

Mr. Justice Anderson's summing up with respect to precinct No. 9 seems to me correct.

I am constrained to agree that there is not a sufficient showing to impeach the election returns as to precinct No. 11. This being so, the court had not the right to count the ballots

and was bound by the tally sheets which show no evidence of alteration.

If Mr. Justice Angstman's view be taken, that is, if it be conceded that the only question before us as to precinct No. 11 is whether the court erred in finding that the ballots were tampered with after being counted by the election officers, it is correct to say that the trial court's finding with respect thereto will not be disturbed unless shown to be erroneous. It follows that the judgment must be affirmed.

MR. JUSTICE ANGSTMAN, concurring in part and dissenting in part: I agree with what is said in the majority opinion with respect to precinct No. 9. As to precinct No. 11, after hearing evidence by the contestant designed to impeach the election returns, and after hearing evidence by contestee in opposition, the court admitted the ballots in evidence over the objection of contestee. The recount by the court showed a change sufficient to affect the result of the election.

To avoid the consequences of declaring Dubie elected commissioner, the court found that these ballots had been tampered with. My associates think the correct result was reached and do so by holding that the ballots were not admissible, since there was not sufficient evidence to impeach the election returns. It is my opinion that whether there was sufficient evidence to impeach the returns is not properly before us. Contestee has made a number of cross-assignments of error, but none is assigned on the action of the court in overruling the objection to the admission of the ballots in evidence. But if the question be properly before us, it is my view that there is sufficient evidence to warrant the court in receiving the ballots in evidence.

Whether the ballots should have been received in evidence was within the sound discretion of the court, and, unless there has been a clear abuse of discretion, this court should not interfere with its ruling in admitting them. (*In re Election Contest for Office of Burgess of Borough of Ellwood City*, 286 Pa. 257, 133 Atl. 379; *Williams* v. *Buchanan*, 86 Ark. 259,

486

110 S. W. 1024; *Cole* v. *Plowhead,* 31 Idaho, 228, 170 Pac. 732.)

In my opinion, the only question before us as to precinct No. 11 is whether the court erred in finding that the ballots had been tampered with after they had been counted by the election officers. On this issue the trial court's determination will, of course, not be disturbed unless clearly erroneous. (*Bolton* v. *Clark,* 162 Md. 471, 68 N. E. 283; *McDonald* v. *Koths,* 63 N. D. 716, 249 N. W. 706.) But the purity of the ballots should be presumed (*Tschetter* v. *Ray,* 28 S. D. 604, 134 N. W. 796), unless otherwise shown.

Since the majority opinion does not treat the question of the correctness of the court's finding that the ballots in precinct No. 11 were tampered with, no useful purpose would be subserved by its consideration here.

Motion for rehearing denied November 24, 1934, MR. JUSTICE ANGSTMAN dissenting.