## GUARDIANSHIP OF REID.

REID, ET AL., APPELLANTS, v. REID, RESPONDENT.

No. 9203.

Submitted October 15, 1953. Decided November 24, 1953.

Rehearing Denied July 9, 1954.

272 Pac. (2d) 1031.

198

Mr. W. G. Gilbert, Dillon, Mr. Lyman H. Bennett, Jr., Bozeman, for Almon G. Reid.

Mr. W. D. Rankin, Mr. Arthur P. Acher, Helena, Mr. Lyman H. Bennett, Jr., Bozeman, Mr. Charles L. Zimmerman, Butte, for Alvin F. Reid.

Mr. Frank E. Blair and Mr. John M. Comfort, Virginia City, Mr. Ralph J. Anderson, Helena, for respondent.

Mr. Bennett, Mr. Zimmerman and Mr. Anderson argued orally.

MR. CHIEF JUSTICE ADAIR:

Appeal from an order settling the account of a guardian. On March 18, 1949, two brothers, Almon G. Reid and George H. Reid, were appointed as co-guardians of the person and estate of their mother Margaret G. Reid, an incompetent person, and thereafter each acted as a guardian until the mother's death on March 13, 1950.

On December 5, 1951, Almon filed in the district court of Madison County a first and final account of his activities as a guardian of his mother's estate which account was set for hearing for ten o'clock a. m., on December 22, 1951, and by order of the Hon. Lyman H. Bennett, district judge presiding, the clerk gave notice thereof by posting notices in three public places at least ten days before such hearing.

The judge further ordered that George be cited and required to produce for examination of the court and to deposit with the clerk of court as a part of the records in said proceeding all cancelled checks, bank debit slips and receipts in his possession or under his control, showing disbursements from the accounts of the ward during the course of the guardianship or to appear in court at the time fixed and show cause, if any, why he should not do so.

On December 13, 1951, George filed an affidavit of disqualification against Judge Bennett for imputed bias and prejudice. Thereupon Judge John B. McClernan was called and accepted jurisdiction in the matter.

Judge McClernan first reset the hearing on Almon's report and final account for January 10, 1952, and later reset the hearing for January 17, 1952.

At the hearing had on January 17, 1952, it was shown by the final account and the testimony of witnesses that at the time such guardianship was created the ward owned about 1,000 acres of deeded land, together with the pertinent Taylor grazing leases, as well as leases of state lands and forest grazing privileges, all of the value of about $250,000, and that she also owned about

4,237 ewe sheep, 94 buck sheep, 164 head of cattle, and 20 horses together with considerable farm machinery and equipment worth $155,000.

It was shown that upon the appointment of the co-guardians, Almon took possession of all the livestock, ranch real estate and ranch equipment and that he managed the ranch and handled the sale of livestock.

Almon testified that his brother George had never objected to his taking over the management of the ranch nor of his selling of the livestock. Almon also testified that he had had many years experience in managing such kinds of property and that George had never come out to assist in the management of either the ranch or the livestock.

George testified: "Q. Did you ever at any time refuse to assist or cooperate with your brother in the care of any part or portion of this livestock and farm and ranch? A. No, sir."

Almon testified that all money belonging to his mother and all the money received from sales of her property was placed in the First National Bank of Twin Bridges; that he drew checks thereon for the payment of hired help and for other ranch expenses; that both guardians were supposed to sign all the checks; that his final account shows that he received during such guardianship the sum of $74,701. 43 and also shows all disbursements, but that he has not all his cancelled checks as George had obtained some of them; that he, Almon, had nothing to do with the mother's real estate in Twin Bridges which was handled by George and that all Almon knew about it was that the rentals were received by George and turned into the bank and correctly reported by Almon in this final account.

Almon further testified that George was vice president of said bank at Twin Bridges and that as a co-guardian George looked after his mother's financial affairs and business, other than the care and management of her ranch and livestock.

George testified that he put in all his time in the matters involving his mother's guardianship during the period of such guardianship; that he kept the books and records that were

used to prepare, settle and pay federal and state income taxes and that he attended to the renewal and checking of leases and forest permits and to the making of federal land bank payments, school section payments, Taylor grazing privileges and all other leases belonging to the estate, and also that he made numerous trips to look over the sheep and made numerous trips to Butte, Helena, Whitehall, Bozeman, Belgrade, the State of Idaho, etc., and that he went wherever else he figured the business required him to go in connection with forest permits, school section leases, sales of cattle, purchases of bucks, and so forth, and that he used his own car in making such trips and that he paid the expenses thereof amounting to $661.

The record further shows that there was much ill will and disagreement between the two co-guardians during the period of the guardianship.

It further shows that following the mother's death the estate was turned over to George who on May 27, 1950, was appointed special administrator of the estate; that on October 26, 1951, Almon and his twin brother Alvin F. Reid were appointed general administrators of their mother's estate, after their mother's will naming George as executor had been held invalid upon a contest instituted by the twin brothers Almon and Alvin. See State ex rel. Reid v. District Court, 126 Mont., 489, 255 Pac. (2d) 693.

It further appears that no inventory was ever filed by Almon who testified he was unable to obtain from George a list of the property which George had in his possession, but that a correct list of all the livestock appears in Almon's final account.

Almon also testified that when he sought to make sales of livestock and attempted to talk with George about same George would not talk, but that George was informed of the sales made as the proceeds were deposited in said bank whereof he was then an officer.

The final account submitted by Almon showed an itemized list of the proceeds received by him as such guardian, amounting to $74,701.43 as well as an itemized list of all disbursements in-

cluding payments of the loan and interest to said bank and the bank balance received by George amounting to the sum of $67,-122.12 and also a bank balance of $7,579.31. In his final account Almon asked for compensation for his services as such guardian in the sum of testament, which on May 16, 1951, had been paid him, also that the court fix the compensation of his attorneys for the professional services they had rendered to him as payment of Almon's account, viz.:

On January 17, 1952, at the time set for the hearing on Almon's account, George appeared and filed written objections as a co-guardian of his mother, then deceased, as an heir at law of the decedent and as a devisee named in decedent's last will and testament, which on May 16, 1951, had been adjudged invalid as aforesaid. George urged the following objections to the settlement of Almon's account, viz:

(1) That Almon, without warrant or authority and without consulting him, took possession of and assumed the management of the ranch and livestock;

(2) That Almon was not entitled to more than $250 a month for his services as a co-guardian;

(3) That prior to making such final account neither Almon nor his attorneys ever notified George or his attorneys that Almon was going to make such final account nor did he recite therein the amount of services rendered by George as a co-guardian or by George's attorneys and that they had not been paid;

(4) That the deceased mother's estate has not been brought in and made a party to the proceeding and that such estate is a necessary and proper party;

(5) That George denies that he refused to join in the payment of any bond premium either due or owing upon the appointment of Almon as co-guardian;

(6) That George denies that he refused access to books and records of said estate to his co-guardian or that he refused to assist or cooperate in the proper activities of Almon as co-guardian.

Upon such objections, George asked:

(1) That the hearing of Almon's account be deferred and considered at the same time set for the hearing of an account by George which would shortly be prepared;

(2) That Almon and his attorneys be refused compensation by reason of Almon's failure to file an inventory and appraisement of all the property;

(3) That upon the hearing to be hereafter had in connection with the accounts of each of the co-guardians the court should make such orders as are requisite in the premises.

The hearing proceeded and was had upon the final account, report and allegations as filed by Almon and upon the above written objections interposed by George thereto at such hearing.

Almon testified that his compensation as guardian should be $500 per month.

George, called as a witness by counsel for Almon, testified:

"Q. Have you now produced into this Court the bank statements there together with all the cancelled checks and debit slips furnished with those bank statements during the entire period during which you were one of the guardians of Margaret G. Reid, an incompetent person, except the month of June 1949? A. All I had, yes.

"Q. I hand you a group of papers fastened with a rubber band and I will ask you whether or not those instruments are the instruments which you have produced as you stated. A. Yes, sir.

"Q. Do those envelopes, twelve in number, contain the entire record which has come to your possession of the bank account of Margaret G. Reid during the period of your guardianship of her estate? A. All but the one.

"Q. Did that one ever come to your possession? A. No, sir.

"Q. These instruments which you hold in your hand are all of the bank records that have come to your possession with reference to that? A. To the best of my knowledge, yes, sir.

"Q. Is each of the checks included in this envelope signed by both you and Almon G. Reid? A. To the best of my knowledge they are.

"Q. And do the bank statements included in this envelope which you hold correctly disclose the condition of the bank account of Margaret G. Reid throughout the course of the guardianship? A. Yes, sir. * * *

"Q. Now, Mr. Reid, are all the checks that you signed that are included in those twelve envelopes you have there necessary expenditures in connection with the estate of Margaret G. Reid during the course of your guardianship? A. To the best of my knowledge, yes sir.

"Q. You don't have any other receipts or vouchers in your possession showing expenditures from the funds of Margaret G. Reid during the course of your guardianship than those instruments that you hold in your hand? A. Not to my knowledge.

"Q. All the funds of this ward were kept in the First National Bank of Twin Bridges in the account as to which the twelve envelopes contained the statements during this guardianship, were they, Mr. Reid? A. Yes, sir."

.: Thereupon the twelve envelopes produced by George were received in evidence without objection and at the request of the trial judge marked as Exhibits 2, 2a, 2b, 2c, 2d, 2e, 2f, 2g, 2h, 2i, 2j, and 2k, same being certified to this court as original exhibits.

George, as a witness in his own behalf, further testified: "Q. Now without any reference whatever to any possible commission that you may have coming but simply on the basis of the work, labor and attention and services that you performed in connection with this estate while you were co-guardian, what did you say in your opinion your services were worth? * * * A. I believe I should be equally compensated with my brother. * * * Oh, I would say about three hundred dollars a month."

Attorney Gilbert, of counsel for Almon, testified as to the professional services performed by him and his associate Mr. Bennett in handling the legal work for Almon while the latter was serving as co-guardian and at the conclusion of his testimony made answer to inquiry by the court as follows: "Q. What is your estimate of the total value of this guardianship estate?

A. The estate, about I would say five hundred thousand dollars. Our time I would say was worth about five thousand dollars, the services we rendered here, total services rendered."

The above statement by Mr. Gilbert indicates that the total services rendered by him and Mr. Bennett were of the value of $5,000 jointly.

During the cross-examination of George, Mr. Blair of his counsel said: "I now move the Court to give us the opportunity of showing the services of George H. Reid as a co-guardian and also his right to compensation and right to compensation of his attorney and let us decide the whole thing at one time and be through with it."

The court then said: "The Court is waiting for some such motion and is pleased to entertain such motion for your compensation; if your client has any facts and figures which you wish to add to this account, let him do it now and get his name entered on this, signed on this."

A recess followed and counsel for George then prepared an affidavit which George signed and swore to, adopting as though it had been prepared by him in the first instance that portion of Almon's first and final account itemizing all the moneys claimed by Almon to have been received and all disbursements made by him as co-guardian of the person and estate of his mother.

Such affidavit further recited that he, George, "is unpaid for his services as co-guardian in such proper amount as should be paid to him therefor either as commissions or as services rendered, his expenses during the period of his co-guardianship amounting to the sum of $661 as well as such proper fees as should be fixed and determined for the services of his attorneys John M. Comfort and Frank E. Blair who advised and represented him during the full period of said guardianship and since with respect thereto."

Attorney Blair testified as to the compensation he and his associate counsel should be allowed as follows: "I should say in connection with this guardianship that we probably invested

some more time than our friends at the other end of the table say that they did. * * * Well, all I know is the impression that the parties themselves have had and what each and all of them have said on written papers and things of that kind, and the testimony I heard given in Court I do not believe that Mr. Gilbert's statement that the estate was probably worth five hundred thousand dollars is exaggerated at all. I think it is probably as near an accurate statement as we could get at. * * * I would like to point out on all of those occasions when the guardianship matters were in Court and being litigated where George was here as co-guardian that we were here, too, you and I and spending the same amount of time and probably the same amount of effort as our friends here and taking into view the whole aspect of our services, yourself and mine together and the results secured and the investment of time and energy, I myself don't think that we would be over-paid at five thousand dollars. I think that is a very reasonable compensation, perhaps too reasonable.''

Attorney Blair further testified: ''I think we invested a great deal more time than you did, that would be my impression although I cannot be sure of that nautrally.''

Here again the statement by Mr. Blair leaves the matter uncertain as to whether he meant $5,000 for each of George's attorneys or that amount jointly.

At the close of attorney Blair's testimony he rested George's case whereupon counsel for Almon objected to the allowance by the court of any fee either to George or to his counsel for the reasons (1) that no notice of the hearing or notice of application was given to anyone; (2) that the proper parties are not before the court and (3) that no evidence was submitted by George as to the truth or falsity of the account. These objections were overruled.

Thereupon the following proceedings were had:

Mr. Bennett (of counsel for Almon): ''We would like to have the Court make a determination on the subject of this owing bond premium.''

By the court: ''The Court figures that can be taken care of down in the compensation. The Court finds and determines that the reasonable compensation to be allowed Almon Reid for his services as co-guardian in this matter is the sum of five hundred dollars a month to be calculated for the time of the guardianship plus the sum of six hundred dollars to take care of this bond premium matter and less the sum of eight hundred dollars. The Court finds and determines that a reasonable compenastion to be allowed to the co-guardian George Reid is a like sum of five hundred dollars per month to be calculated over the period of time plus the sum of six hundred dollars for the expenses. It being further ordered that the said co-guardian file his vouchers to support this allowance within sixty days. * * *

''The Court finds and determines that the reasonable sum to be allowed to each of the counsel of record in this case, namely Mr. Blair and Mr. Comfort and Mr. Bennett, Jr. and Mr. Gilbert is the sum of five thousand dollars. The counsel were modest in their demands for counsel fees and by reason of being compelled to engage in and litigate this unpleasant family battle is the reason why the fee is fixed in the amount it is.''

Counsel for Almon excepted to the findings of the court and requested time in which to prepare and serve a bill of exceptions and the trial court made and caused to be entered in the minutes of the court an order in accordance with its findings.

On January 23, 1952, and following the entry of the above order, counsel for Almon filed various objections thereto which were overruled by a final order made on January 24th, confirming all sales, settling said first and final account and fixing the compensation as stated above for each of the two guardians and for each of the four attorneys so representing them.

From the order settling the account Almon Reid as guardian and Alvin and Almon as administrators of their mother's estate have appealed.

We have reviewed the testimony at considerable length to illustrate the conflicts and also the presence of much substantial evidence that supports the findings and orders of the trial court.

Appellants lay much stress upon the fact that George did not file a separate final account nor did he give the usual notice of hearing thereon. ·

The record shows that upon filing the final account by Almon the notice of hearing was duly given as required by R. C. M. 1947, sec. 91-4907, and that George was also ordered by the court to produce for examination by the court all records, checks, deposit slips and receipts in his possession, thus in effect providing that the final account would become the joint account of the two guardians.

R. C. M. 1947, sec. 91-4908, provides: "*Allowance of accounts of joint guardians.* When an account is rendered by two or more joint guardians, the court or judge may, in its or his discretion, *allow the same upon the oath of any of them.*" Emphasis supplied.

George had notice. He appeared at the hearing. He produced the records then in his possession as a co-guardian. He also filed an affidavit stating that the material portions of the final account as filed by Almon were correct, but indicated that his own expenses as a co-guardian in the sum of $661 had not been paid.

Thus in effect was said final account filed and verified by both Almon and George as co-guardians. The procedure followed was sufficient to authorize the trial court to accept and approve the documents as a joint final account.

In In re Kostohris' Estate, 96 Mont. 226, 232, 29 Pac. (2d) 829, 832, this court said: "The notice required in probate proceedings serves the purpose of a summons in an ordinary action and is jurisdictional, but, as in the ordinary action, appearance and participation in the action cure the defect of failure of service, so in a probate proceeding, appearance and participation in the proceedings cure defective notice or failure to give notice, and one who has appeared and taken part in the hearing, as did the former guardian and his counsel here, will not be heard to say that the court did not have jurisdiction to determine his rights or liabilities. In re Davis' Estate, 35 Mont. 273, 88 Pac.

957; Hoppin v. Long, 74 Mont. 558, 241 Pac. 636; Oliveri v. Maroncelli, 94 Mont. 476, 22 Pac. (2d) 1054."

It stands undisputed that the estate here involved was worth ██ between four and five hundred thousand dollars; hence there is much substantial evidence to sustain the trial court's ruling as to the reasonableness of the compensation allowed the two co-guardians and also to that allowed their respective attorneys.

The orders granted appellant all the compensation he demanded for his services and also all that he demanded on behalf of his counsel. The amounts granted to compensate respondent and his counsel were within the amounts provided for by statute.

In Dubie v. Batani, 97 Mont. 468, 482, 37 Pac. (2d) 662, 669, this court said, quoting from Lane v. Bailey, 29 Mont. 548, 75 Pac. 191, "An appellate court will not reverse a judgment merely because the lower court committed error; it is only when the error has materially affected appellant's rights on the merits of the case." Compare Trenouth v. Mulroney, 124 Mont. 499, 508, 227 Pac. (2d) 590.

R. C. M. 1947, sec. 91-5210, provides: "All orders must be entered in the minutes of the court kept for probate proceedings in accordance with the provisions of section 91-4301. The provisions of this Title, relative to the estates of decedents, so far as they relate to the practice in the district court, apply to proceedings under sections 91-4601 to 91-5211." R. C. M. 1947, secs. 91-4601 to 91-5211 apply to guardianship matters. See also R. C. M. 1947, sec. 91-5013.

In Oliveri v. Maroncelli, 94 Mont. 476, 479, 22 Pac. (2d) 1054, 1055, this court said: "By the terms of section 10463, Id., the provisions of sections 10018 to 10464, Revised Codes of 1921 (the probate practice sections), are made applicable to proceedings in *guardianship*." Section 10463 included in the sections mentioned is now R. C. M. 1947, sec. 91-5210. See also In re Kostohris' Estate, supra.

R. C. M. 1947, sec. 91-3405, a part of the law governing probate practice, provides that the expenses to be allowed executors and

administrators *including reasonable attorney's fees are to be determined and fixed by the court* in the absence of agreement, and R. C. M. 1947, sec. 91-3407, provides a guide for determining the compensation of executors and administrators when same is not provided by will. See also In re Culver's Estate, 91 Mont. 475, 479, 8 Pac. (2d) 662.

Upon the authorities cited and for the reasons stated the action and orders of the district court are affirmed.

MR. JUSTICES FREEBOURN, ANGSTMAN and ANDERSON, concur.

MR. JUSTICE BOTTOMLY: (dissenting).

I dissent. The record in this co-guardianship is so very clear as to the reasonable attorneys' fees testified to as reasonable, by respective counsel.

Attorney Gilbert testifying as to a reasonable fee for himself and Mr. Lyman H. Bennett, Jr., attorneys for Almon G. Reid, one of the co-guardians, stated: "Our time I would say was worth about five thousand dollars, the services we rendered here, total services rendered." There can be no question about that statement, that the joint fee he was asking for was $5,000.

Mr. Blair thereafter being examined by his co-counsel Mr. Comfort, testifying as to the compensation of himself and Mr. John M. Comfort, counsel for George H. Reid, co-guardian with his brother Almon G. Reid, stated: "I would like to point out on all of those occasions when the guardianship matters were in court and being litigated where George was here as co-guardian that we were here, too, you and I and spending the same amount of time and probably the same amount of effort as our friends here taking into view the whole aspect of our services, *yourself and mine together* and the results secured and the investment of time and energy, I myself don't think that *we* would be overpaid at five thousand dollars. I think that is a very reasonable compensation, perhaps too reasonable." Emphasis supplied. It is only reasonable to believe that the $5,000 so testified to was the total joint fee for Mr. Blair and Mr. Comfort.

By its order of January 24, 1952, the court, in granting double the amount of the attorneys' fees, or $5,000 for each of the four attorneys, or $20,000 attorneys' fees in this guardianship matter, being twice the fee the evidence indicated as reasonable, abused its discretion. I would reverse said order on this particular alone.